ALEX M. TOPP *et al.*, Plaintiffs-Appellants, v. PATRICK LOGAN, Defendant-Appellee.

First District (6th Division)   No. 1—88—3060

Opinion filed March 30, 1990.

Barry D. Goldberg and Barth H. Goldberg, both of Goldberg & Goldberg, of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellants.

Wildman, Harrold, Allen & Dixon, of Chicago (Lawrence Helms and M. Jayne Rizzo, of counsel), for appellee.

PRESIDING JUSTICE LaPORTA delivered the opinion of the court:

Plaintiffs brought an action against defendant, Patrick W. Logan, M.D., seeking damages for personal injuries allegedly sustained as a

result of negligent medical treatment. After a jury trial, a verdict was returned in favor of defendant, and the trial court entered judgment on the verdict. Plaintiffs have appealed the judgment in favor of defendant, alleging that they were deprived of the right to a fair trial and that the verdict was against the manifest weight of the evidence.

Plaintiffs claimed that defendant failed to take proper and adequate steps to diagnose and treat the ulcer disease of Alex M. Topp (Topp). Topp sought compensation for permanent injuries allegedly suffered as a consequence of defendant's negligent conduct, and his wife sought recovery for loss of consortium.

The trial on this cause commenced on August 29, 1988. During *voir dire* of the first panel of the venire, plaintiffs' counsel indicated that he was looking for jurors who could be fair and impartial, and he inquired whether the members of the panel had any question about their ability to be fair. All of the members of the first panel answered in the negative.

Following plaintiffs' *voir dire* and tender to defense counsel of the first panel of the venire, plaintiffs' counsel noticed that defendant's pregnant wife was seated in a chair behind defendant, who was sitting at counsel table. During a break in the proceedings and outside the presence of the venire, plaintiffs' counsel moved for a mistrial. He argued that the seating location of defendant's pregnant wife would lead the prospective jurors to connect her with defendant and would arouse sympathy on defendant's behalf, thereby prejudicing plaintiffs and depriving them of a fair trial.

Defense counsel opposed the motion for a mistrial, claiming that defendant's wife sat behind her husband at counsel table because there were no vacant seats in the gallery when the proceedings began. The trial court denied plaintiffs' motion for a mistrial, but ordered that defendant's wife be placed back in the gallery and that she have no contact with defendant in the presence of the prospective jurors. The court subsequently instructed defense counsel to direct defendant's wife to a bench seat in the gallery.

When the proceedings resumed, defense counsel gestured for defendant's wife to take a seat in the gallery. During a side bar outside the presence of the venire, plaintiffs' attorney subsequently renewed his motion for a mistrial, arguing that defense counsel's gesture directing defendant's wife to a gallery seat had violated the court's prior order prohibiting contact with defendant in the presence of the venire. Plaintiffs' attorney asserted that the attention of the venire members in the jury box had been drawn to defense counsel

as she directed defendant's wife to a gallery seat. The trial court again denied plaintiffs' motion for a mistrial.

The *voir dire* then progressed without incident. The venire was questioned by the trial judge and by plaintiffs' and defendant's counsel. The prospective jurors indicated that they did not have any feelings one way or another which would affect their judgment about the lawsuit. All of the members of the venire ultimately chosen to serve on the jury stated that they could be fair and keep open minds until they went into the jury room to deliberate. The potential jurors were repeatedly reminded through questioning that any verdict rendered must depend on the evidence that would be introduced at trial and not on outside factors, including sympathy or prejudice. Defendant's wife was present in the gallery throughout the entire trial.

The evidence adduced at trial revealed that Topp first saw defendant on November 6, 1980, for a routine checkup and continued seeing him once or twice a year for physical examinations through August 1982. During his first visit to defendant's office, Topp completed a medical history form in which he reported a family history of peptic ulcer disease, that aspirin caused him gastrointestinal upset and that he had an ulcer in 1966. These facts were also included in the medical history taken by a nurse practitioner in defendant's office in 1980. The nurse practitioner conducted a physical examination and prepared a five-page report which did not reflect that Topp had any complaints of a stomach problem or the presence of a duodenal ulcer.

Due to his illness, Topp was unavailable to testify at trial, and his evidence deposition was admitted. Topp testified that all of his brothers and sisters had suffered from ulcers, that four of his siblings had had surgery for an ulcer condition, but only two of the four had survived the surgery. Topp testified that during the three-year period over which he saw defendant, he had continuing problems with back pain of which he advised defendant. Topp described the back pain as "a little burning" above his waist which affected his ability to sleep. He stated that he usually felt the pain at night and that it went away if he drank milk. Topp indicated that he had never felt any pain in the front part of the abdomen until the day before he was admitted to the hospital in October 1982. He informed defendant that he swam approximately one-half mile six days each week. Topp also stated that defendant did not discuss any diagnosis of his condition prior to his hospitalization in 1982.

Topp testified that defendant initially advised him to take aspirin for his back pain. Because Topp experienced heartburn from aspirin,

defendant instructed him to take Ecotrin. From 1980 through 1982, defendant performed blood tests, X rays, and urine tests. Topp also indicated that on almost every visit, defendant performed stool tests, and blood was never noted in his stool.

Topp testified that he saw defendant approximately one week before his ulcer surgery in October 1982. At that time, he told defendant that he could not sleep at night, had a fever, and had pain in his back. Defendant told Topp that he might have a cold and did not prescribe any medication.

Topp's wife testified at trial that her husband experienced pain down his back and across his shoulders in June 1982. He was awakened from sleep by the pain and had heartburn or a burning pain after meals. After seeing defendant for a regular checkup in July 1982, Topp began taking Ascriptin, a combination of aspirin and antacid. Topp returned to defendant on August 20, 1982, because his pain had become more severe. Specifically, he was experiencing heartburn, increased pain in his shoulder, and was awakened from sleep by the pain.

Mrs. Topp testified that from August 20, 1982, to October 14, 1982, although he had stopped taking Ascriptin, her husband had some nausea and vomiting, extreme pain down his back and right side, stomach pains, and a temperature of 100 degrees. When Topp saw defendant again on October 18, 1982, she reminded him to tell defendant that the pain was similar to that he had experienced when he suffered from his previous ulcer. Mrs. Topp acknowledged that her husband did not complain of stomach or ulcer pains from 1980 to July 1982.

Dr. Robert Magrisso, Topp's treating physician, testified that Topp was admitted to the hospital on October 19, 1982, and was discharged on November 20, 1982. Pursuant to Magrisso's order, an upper-GI test was performed shortly after Topp was admitted to the hospital. The results of that test revealed that Topp had a perforated ulcer. Magrisso stated that the signs and symptoms of a duodenal ulcer or peptic ulcer include mid-abdominal pain that is relieved with food ingestion; vomiting; black stools; nausea; and pain that is relieved by antacids. Vague abdominal and back pain may also be signs of an ulcer. Magrisso indicated that a patient may be awakened from sleep by the pain from a duodenal ulcer, and taking aspirin can make an ulcer worse. He stated further that it is not uncommon for a person who has a duodenal ulcer to have a recurrence of that condition.

According to Magrisso, if the pain experienced by Topp was the same as that he experienced 20 years ago with his prior ulcer, that

would be a significant factor in reaching a diagnosis. If Topp experienced pain for two months, that would also be significant in diagnosing his condition. Magrisso stated that if he was told these things, he would have put them in the patient's chart.

Magrisso also testified that Topp's clinical picture was consistent with several different disorders and that a diagnosis could not have been made during Topp's initial two days in the hospital. He stated further that it would not have been appropriate to initiate therapy for peptic ulcer disease or to order that an upper-GI or an endoscopy be done immediately. Magrisso, the hospital intern, and the resident each took independent histories from Topp and conducted physical examinations which led them to consider many possible diagnoses, including gallbladder, liver, and pancreas problems; lumbo-sacral spine disorders; brain disorders, cancer of the stomach; a heart valve infection; and peptic ulcer disease.

Dr. Caprini, another of Topp's treating physicians, was called in as a surgical consultant during Topp's hospitalization. After reviewing the hospital chart, defendant's office records, and his own record, he stated that Topp's condition was confusing. Upon review of the upper-GI series performed on Topp on October 21, 1982, Caprini determined that Topp was not in acute distress, but diagnosed him as having a perforated duodenal ulcer. He indicated that a perforation was an uncommon complication of peptic ulcer disease, and stated that he was surprised at how well Topp had looked when compared to his X ray. Caprini took a medical history from Topp which reflected that Topp had a prior history of ulcer disease and had been sick some time before being hospitalized. Topp was admitted to the hospital because his blood electrolytes were abnormal. He was weak, fatigued, nauseous, had a temperature of 100 degrees, and had back pain as well as intermittent abdominal pains. Topp did not have severe abdominal tenderness or peritonitis, both of which are typical in cases of perforated ulcer.

Caprini testified that the symptoms of ulcer disease include pain after meals which is relieved by antacids; an acid taste in the mouth; nausea or vomiting; and pain in the chest, back and other spots in the upper abdomen. He also noted that a previous history of peptic ulcer disease increases the risk of a recurrence. If Caprini suspected that a patient suffered from an ulcer, he would order an upper-GI examination, endoscopy, and gastroscopy.

Caprini performed surgery on Topp and found a perforated duodenal ulcer with severe acute inflammation and an early abscess formation which extended into the gallbladder. The ulcer had perforated

anteriorly through the wall of the duodenum and onto the gallbladder. Caprini removed Topp's gallbladder and the lower half of his stomach, resected the stomach, bypassed the duodenum, and oversewed the duodenum.

Caprini concluded that Topp had two ongoing processes: the ulcer disease and the gallbladder disease. Some of his symptoms were indicative of the ulcer disease, and others were consistent with the gallbladder disease. Caprini could not determine how long the ulcer condition had existed, but believed that the gallbladder problem had existed for a long period of time. He testified, however, that back pain in the upper back is indicative of gallbladder disease, whereas back pain in the lower back is indicative of peptic ulcer disease. In his opinion, the symptoms experienced by Topp prior to his hospital admission were more compatible with gallbladder disease than with peptic ulcer disease.

Dr. Schwartz, plaintiffs' expert, testified that the most common symptom of peptic ulcer disease is pain or discomfort which tends to be located in the middle of the abdomen, but in about 20% of the cases, it is located in the back. The pain generally comes on some time after eating and tends to be relieved by ingestion of food or antacids. The pain will tend to recur at the same time of the day and often wakes the patient from sleep.

Schwartz testified further that in 1982, the methods of diagnosing peptic ulcer disease included a careful and extensive medical history and physical examination, a stomach X ray, and an endoscopy or gastroscopy. Schwartz emphasized the importance of taking down the patient's history in the chart and indicated that aspirin can cause or aggravate peptic ulcer disease. He also indicated that once a patient has had peptic ulcer disease, the chance of that patient getting it again are high. If that patient experiences certain symptoms, the doctor must be very attuned to peptic ulcer disease. Schwartz also stated that a doctor should know that 20% of the people who have peptic ulcer disease experience back pain.

Schwartz indicated that a family history of peptic ulcer disease signals a person's chances of getting a peptic ulcer. He also stated that the pain of peptic ulcer tends to be the same in the same person. Normally, when a patient states that an ulcer has returned, the doctor should initiate treatment as a precaution by prescribing medication to stop the production of acid in the stomach. If the symptoms have not been resolved at the end of a two-week period, Schwartz indicated that an upper-GI examination and, in certain cases, an endoscopic examination should be performed. According to Schwartz, ad-

herence to the medical standard of care in 1982 would have required defendant to presume that Topp suffered from recurrent peptic ulcer disease.

Schwartz indicated that pain in the back with an ulcer strongly suggests that the ulcer is penetrating the wall of the duodenum. He also stated, however, that back pain may indicate a host of other problems, including gallbladder disease or a pancreatic disorder. Schwartz also conceded that aspirin could have irritated Topp's stomach, and musculoskeletal pain could have been caused by increased exercise. Schwartz acknowledged that defendant would have deviated from the applicable standard of care if he had not considered possible diagnoses other than peptic ulcer disease on August 20, 1982. Schwartz stated that defendant did not deviate from the applicable standard of care by not ordering an upper-GI series or by not instituting ulcer medication on August 20, 1982.

Schwartz also acknowledged that loss of appetite, nausea, and burning in the midriff may be symptoms of diseases other than a peptic ulcer. He conceded further that on October 14, 1982, Topp had symptoms consistent with a virus and with gastritis or gastric inflammation possibly caused by ingestion of aspirin.

Schwartz concluded, however, that in his opinion, defendant did not act as a reasonably qualified, well-trained physician and did not meet the standard of care for Cook County in his treatment of this patient. Schwartz listed several criticisms of defendant's conduct on August 20, 1982, and on October 14, 1982, including disregard of the symptoms described by the patient; disregard of the patient's belief that his prior ulcer was recurring; disregard of a history of duodenal ulcer in this patient; disregard of a strong family history of peptic ulcer; failure to follow up on the patient's complaint of pain; failure to investigate the probability of peptic or duodenal ulcer; failure to treat the symptoms of peptic ulcer with medication; and instructing the patient to take Ascriptin, which should not be used by patients with peptic ulcer disease.

According to Schwartz, Topp exhibited classic symptoms of an ulcer which defendant ignored. Schwartz testified that in his opinion, defendant's deviations from the standard of care were directly responsible for the perforation of the ulcer and the operation performed on Topp, including the loss of the gallbaldder and a portion of the stomach. Schwartz did not criticize defendant's treatment of Topp on October 18, 1982, or thereafter.

Defendant, a board-certified specialist in internal medicine, testified that he was expert in caring for patients with peptic and duode-

nal ulcer disease. He stated further that on each visit with Topp, his care and treatment of this patient complied with the applicable standard of care.

When he first examined Topp on November 6, 1980, Topp reported no complaints. Defendant received no information indicating that Topp had felt any recurrence of his ulcer between 1966 and 1980. From November 1980 to July 1982, Topp consulted defendant on several occasions but did not complain of any symptoms which could be related to an ulcer, and during the July 15, 1982, examination, Topp reported no complaints whatsoever.

The next contact defendant had with Topp was on August 19, 1982, when he called defendant's office and reported that he had been experiencing pain across his back at the level of his shoulder blades for six days. Topp indicated that Ascriptin was somewhat effective in relieving the pain and the pain subsided following food ingestion. Topp also stated that he had increased his exercise every morning.

Defendant examined Topp on August 20, 1982, and found that Topp had vague paravertebral discomfort in the chest area, similar to the pain he had experienced in the past when he had developed a duodenal ulcer. Defendant also discovered that Topp had been taking Ascriptin, which had never been prescribed by defendant. His physical examination revealed that Topp's abdomen was not tender and that there was no blood in his stool. Defendant considered a recurrent duodenal ulcer in his differential diagnosis, but based upon the patient's previous intolerance of aspirin, defendant believed that his discomfort could have been caused by the aspirin. Defendant advised Topp to discontinue the aspirin and to observe the response. Defendant considered that the back pain, an uncommon symptom of duodenal ulcer, could have been musculoskeletal pain resulting from Topp's increased exercise. Defendant instructed Topp to contact him again if the symptoms continued. Defendant's advice was predicated upon information indicating that Topp had not had any problem with peptic ulcer disease since 1966 and had been taking aspirin which can cause gastritis, as well as the results of the physical examination which did not suggest the presence of ulcer disease.

Although Topp had never demonstrated a reluctance to contact defendant before, he did not call defendant's office from August 20, 1982, to October 14, 1982. When he did call on October 14, 1982, Topp complained of general aches; fever to 100 degrees; decreased appetite; mild nausea; burning around the midriff; and aches in the chest area. When he conducted his physical examination, defendant

noted that Topp's temperature was 99 degrees; the whites of his eyes were red; his throat was inflamed; his neck was supple; his blood pressure was 130/70; his chest was clear; he had a systolic heart murmur; his abdomen was soft; he had no skin rash; and there was no blood in his stool.

Defendant testified further that he learned that Topp was still taking aspirin on October 14, 1982. Defendant believed that Topp's complaints were most consistent with a viral illness and that the burning around the midriff was related to a drastic irritation from the aspirin. In light of these symptoms, defendant testified that peptic ulcer would have been far down a list of differential diagnoses. Defendant advised Topp to take acetaminophen for fever, rest, take fluids, and to call if his condition did not improve. Mrs. Topp called defendant's office on October 16, 1982, and reported that in addition to the same symptoms of viral syndrome he was experiencing two days earlier, her husband had hiccoughs. Because he did not feel that Topp's condition had changed significantly defendant again advised Topp to stop taking aspirin, continue resting, and to call if the symptoms persisted.

Two days later, Topp again saw defendant and indicated that since August 1982, he had been experiencing upper-back pain which improved with aspirin. Topp also reported that he had been experiencing generalized malaise, nausea, hiccoughs, fever of 100 degrees, and one episode of vomiting during the previous four days. Topp denied that he had any abdominal pain. Defendant conducted a complete physical examination and performed an abdominal X ray, a complete blood count, and a urinalysis. Defendant assessed that Topp may have had a viral syndrome or an intra-abdominal problem, but concluded that his medical history had changed over the previous four days. Although defendant planned to review the blood tests the following morning, he ordered an upper-GI test and an ultrasound to determine whether Topp had a peptic ulcer or problems with his gallbladder, pancreas, or liver.

When he received the results of Topp's blood tests, defendant noted a significant abnormality in the levels of serum sodium and serum chloride. Defendant telephoned Mrs. Topp and told her that her husband needed immediate hospitalization to correct and determine the cause of the imbalance in the serum sodium. Defendant arranged to have Topp cared for by Dr. Magrisso at Glenbrook Hospital. When Topp was admitted to the hospital, defendant discussed his condition with Dr. Magrisso and with Dr. Stephen Knight, the admitting intern. He related the possibility that Topp was suffering from an in-

tra-abdominal problem, including peptic ulcer disease. Defendant also discussed ordering an upper-GI examination, an ultrasound and an oral cholecystogram with the other two doctors. Defendant rendered no further medical care to Topp after his admission to the hospital on October 19, 1982.

Defendant's expert witness, Dr. Edwin J. Zarling, a board-certified gastroenterologist, testified that defendant had complied with the applicable standard of care in his treatment of Topp. Zarling stated that the information about Topp available to defendant on August 20, 1982, represented very vague and nonspecific pain. He confirmed that the most common symptom of duodenal ulcer is abdominal pain below the ribs and above the navel, but Topp did not report such pain on August 20, 1982. Nonetheless, defendant considered the patient's previous history of duodenal ulcer and his claim that he had back pain similar to that he had experienced with his prior ulcer. Zarling indicated that these facts were not of great significance as of August 20, 1982, because Topp's 1966 ulcer had been healed, because patients may have difficulty remembering pain over a 16-year period, and because pain between the shoulder blades is a very unusual location if it is caused by duodenal ulcer. He stated further that ulcer pain can be experienced in the back on rare occasions. When this is so, however, the pain is usually located in the lower part of the ribs or the lower thoracic region, and not in the upper part of the ribs near the shoulder blades. Zarling also indicated that increased exercise could have accounted for arthritic or musculoskeletal pain near the shoulder blades. Because Topp's pain apparently subsided with food ingestion, he had a history of intolerance to aspirin, and he reported that he had recently begun to take aspirin, defendant properly ordered the discontinuance of aspirin to see what the response would be.

Zarling agreed that a patient has a greater chance of developing an ulcer if he has a family member who has had a duodenal ulcer or if he has had an ulcer in the previous 12 months. He testified, however, that if such an individual lives for many years without a recurrence, his risk of having a recurrence is diminished greatly. Zarling stated that given the information available to defendant on August 20, 1982, a reasonably well-qualified physician would consider such possible diagnoses as musculoskeletal strain, arthritis, and gallbladder problems or that aspirin could have been causing the pain. Although peptic ulcer disease might cross the doctor's mind, the clinical picture did not suggest that diagnostic tests or ulcer medication were warranted. Zarling concluded that defendant's treatment of Topp on

August 20, 1982, was appropriate and within the applicable standard of care.

Zarling also testified that Topp's condition on October 14, 1982, supported defendant's diagnosis of viral syndrome. He concurred with defendant's assessment that the burning in the midriff on that date may have been associated with the patient's ingestion of aspirin, and he disagreed with Dr. Schwartz' opinion that a presumptive diagnosis of peptic ulcer disease should have been made. Zarling indicated further that defendant acted appropriately and within the applicable standard of care in his treatment of Topp after October 14, 1982.

The jury returned a verdict in favor of defendant, and plaintiffs have appealed.

Plaintiffs first contend that they were denied a fair trial because defendant's pregnant wife sat directly behind him during the *voir dire* of the first panel of the venire and later was directed to a seat in the gallery by defense counsel. Plaintiffs argue that the court erred in refusing to declare a mistrial and order a new trial. This argument is without merit.

■■ ■ The decision to declare a mistrial rests within the sound discretion of the trial court based on the particular circumstances of the case, and the court's ruling will not be disturbed on review absent a clear abuse of discretion. (*Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 844, 462 N.E.2d 645, 653; *Benuska v. Dahl* (1980), 87 Ill. App. 3d 911, 913, 410 N.E.2d 249, 251.) A mistrial should be granted only when there is an occurrence of such character and magnitude as to deprive a party of a fair trial and the moving party demonstrates actual prejudice as a result. (*Tuttle*, 122 Ill. App. 3d at 844, 462 N.E.2d at 653; *Benuska*, 87 Ill. App. 3d at 913, 410 N.E.2d at 251.) Upon careful review of the entire record, it does not appear that plaintiffs were actually prejudiced by the presence of defendant's wife or that the trial court abused its discretion in refusing to declare a mistrial and order a new trial of the cause.

■ The record reflects that defendant's wife was seated behind her husband during the *voir dire* of the first panel of the venire. When this fact was brought to the attention of the trial judge, he ordered that defendant's wife be seated in the gallery and instructed defense counsel to direct her to a vacant bench seat. After a recess in the proceedings, defense counsel gestured for defendant's wife to take a seat in the gallery. There is no indication that defendant's wife disrupted the proceedings or engaged in any conversation with defendant or his counsel in the presence of the jury. Illinois courts have held

that it is not reversible error to permit members of a party's family to remain in the courtroom. (See *Kerns v. Engelke* (1977), 54 Ill. App. 3d 323, 336, 369 N.E.2d 1284, 1294, *aff'd in part & rev'd in part on other grounds* (1979), 76 Ill. 2d 154, 390 N.E.2d 859; *Cunningham v. Central & Southern Truck Lines, Inc.* (1968), 104 Ill. App. 2d 247, 265, 244 N.E.2d 412, 421-22.) Only one Illinois case has held it to be reversible error to permit members of a party's family to remain in the courtroom, and the basis of that decision was that it would have been error to admit evidence that the party had a wife and children. (*Barnett v. Noble* (1910), 155 Ill. App. 129, 131.) That case is factually distinguishable from the present case. Here, the plaintiffs did not move to exclude defendant's wife from the courtroom and did not argue that evidence of defendant's marital status would have been inadmissible. Consequently, the trial court acted in accordance with the prevailing Illinois law by ordering that defendant's wife be allowed to remain in the courtroom as long as she was seated in the gallery.

■ Moreover, it does not appear that plaintiffs were prejudiced in any way by the fact that defendant's wife sat behind him during a portion of the *voir dire* of the first panel of the venire. There was no indication that she disrupted the proceedings or engaged in any conversation with her husband or his counsel in the presence of the jury. As soon as the court ordered that defendant's wife be seated in the gallery, defense counsel obeyed the court's instruction and directed her to a vacant bench seat. As defendant points out, his wife was present in the courtroom throughout the duration of the trial. Consequently, the jury was bound to infer that she was married, or in some way related, to defendant. In light of this fact and the plaintiffs' failure to move to exclude defendant's wife from the courtroom altogether, it does not appear that her seating behind defendant for a small portion of the *voir dire* resulted in any actual prejudice to plaintiffs or deprived them of a fair trial.

Contrary to plaintiffs' claim, this case cannot be compared to those in which a participant has given vent to hysterical exclamations (*Bauer v. Timucci* (1975), 33 Ill. App. 3d 1051, 339 N.E.2d 434; *Halpin v. Pekin Thrifty Drug Co.* (1967), 79 Ill. App. 2d 153, 223 N.E.2d 708; *Chicago & Erie R.R. Co. v. Meech* (1896), 163 Ill. 305, 45 N.E. 290), nor is it similar to cases in which improper conduct by counsel deprived a party of a fair trial (*Palmer v. Emery Transportation Co.* (1970), 130 Ill. App. 2d 125, 268 N.E.2d 238; *Jacobson v. National Dairy Products Corp.* (1961), 32 Ill. App. 2d 37, 176 N.E.2d 551).

■ In addition, plaintiffs' assertion that defense counsel violated

the trial court's order by gesturing toward a gallery seat is unpersuasive. The court did not order that defendant's wife could not be seen with counsel. Rather, the court merely held that she was not to have any contact with defendant in the presence of the prospective jurors. The trial judge clearly did not believe the order had been violated when he denied the plaintiffs' second motion for a mistrial, and upon review it does not appear that defense counsel's action warranted a new trial.

Counsel for plaintiffs had the opportunity to question all of the venire members ultimately chosen to serve on the jury and did not reject any of them based upon a showing that the prospective jurors were prejudiced in favor of defendant because his pregnant wife was present in the courtroom. Counsel was apparently satisfied when the jury had been compiled that they could be fair and impartial and render a verdict based upon the evidence. Plaintiffs have not shown that they were actually prejudiced by the presence or seating location of defendant's wife, and the trial judge did not abuse his discretion in refusing to declare a mistrial and order a new trial.

We next address plaintiffs' claim that the jury's verdict in favor of defendant was against the manifest weight of the evidence.

■■ A jury verdict should be set aside and a new trial ordered only where the plaintiff has established that the verdict was against the manifest weight of the evidence. (*Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32, 36; *Monier v. Winkler* (1987), 158 Ill. App. 3d 724, 729, 511 N.E.2d 246, 250.) A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon the evidence. *Monier*, 158 Ill. App. 3d at 729, 511 N.E.2d at 250; *Anderson v. Beers* (1979), 74 Ill. App. 3d 619, 623, 393 N.E.2d 552, 555.

■■ ■ In order to prove negligent treatment by a medical professional, the plaintiff must establish the proper standard of care, a negligent failure to comply with the standard, and that the injury for which the suit was brought was proximately caused by the negligent conduct of the professional. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279, 282; *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423-24, 328 N.E.2d 301, 305; *Pumala v. Sipos* (1987), 163 Ill. App. 3d 1093, 1098, 517 N.E.2d 295, 298.) The weight to be given to the expert testimony in such cases is for the trier of fact to determine. (*Walski*, 72 Ill. 2d at 260, 381 N.E.2d at 284; *Borowski*, 60 Ill. 2d at 424, 328 N.E.2d at 305.) Where the evidence is conflicting, it is within the province of the jury to resolve the conflict, and a jury's

verdict based upon conflicting evidence should not be set aside unless the opposite conclusion was clearly evident. *St. Gemme v. Tomlin* (1983), 118 Ill. App. 3d 766, 768, 455 N.E.2d 294, 296; *Monier*, 158 Ill. App. 3d at 729-30, 511 N.E.2d at 250.

■ In the instant case, the evidence presented by plaintiffs clearly conflicted with that presented by defendant. Plaintiffs introduced evidence indicating that Topp repeatedly advised defendant about his back pain and that he described the pain as resembling that experienced when his prior ulcer was active. In addition, plaintiffs introduced expert testimony indicating that defendant had violated the applicable standard of care and that defendant's violation of that standard in the care and treatment of Topp proximately caused his injuries. Plaintiffs' expert also acknowledged, however, that Topp's symptoms were indicative of several different diagnoses and that defendant would have deviated from the standard of care if he had not considered possible diagnoses other than peptic ulcer disease.

Defendant introduced evidence indicating that during most of his visits with Topp, he did not report any problems or pain. Defendant testified that he did consider the complaints of back pain by Topp in August 1982 and the fact that Topp had previously had an ulcer in 1966. Defendant explained, however, that Topp's symptoms were not indicative of ulcer disease and that the results of his physical examinations did not suggest a recurrence of the prior ulcer. Defendant believed that Topp's discomfort could have been caused by ingestion of aspirin or by increased exercise. When Topp's condition changed for the worse on October 18, 1982, defendant hospitalized him and ordered an upper-GI series and an ultrasound to determine whether Topp had a peptic ulcer or problems with his gallbladder, pancreas, or liver. Defendant also presented expert testimony indicating that he had acted appropriately in the care and treatment of Topp where the observable symptoms supported defendant's diagnosis of viral syndrome and were consistent with many diagnoses other than peptic ulcer disease.

The jury heard and considered all of the evidence presented and resolved the conflict in favor of defendant. Upon review of the record, it does not appear that the opposite conclusion was clearly evident. Consequently, the trial court did not err in refusing to set aside the jury's verdict.

■■ Moreover, plaintiffs failed to establish that defendant's conduct was the proximate cause of the injuries suffered by Topp. To establish proximate cause in a case alleging negligent delay in diagnosis or treatment, the plaintiff must present evidence which shows with a

reasonable degree of medical certainty that the delay in diagnosis or treatment lessened the effectiveness of treatment. (*Pumala*, 163 Ill. App. 3d at 1098, 517 N.E.2d at 298.) In the case at bar, the evidence did not indicate that Topp's injuries were the result of defendant's failure to order an upper-GI or an endoscopy prior to October 18, 1982, or that surgery could have been avoided if defendant had ordered these tests earlier. Thus, the jury's verdict was supported by the evidence in the record, and the court properly denied plaintiffs' request for a new trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN and RAKOWSKI, JJ., concur.