NORMA BIANCHI, Special Adm'x of the Estate of Edwin Bianchi, Deceased, Plaintiff-Appellant, v. AUDREY MIKHAIL, Special Adm'x of the Estate of Kamel A. Mikhail, *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—90—0314

Opinion filed October 3, 1994.

Hofeld & Schaffner, of Chicago (Gerald E. Nora, of counsel), for appellant.

Pretzel & Stouffer, Chartered, of Chicago (Leo M. Tarpey, Jr., Robert Marc Chemers, and Scott O. Reed, of counsel), for appellee Mohammed E. Darwish.

Wildman, Harrold, Allen & Dixon, of Chicago (Ruth E. VanDemark, Joan M. Fencik, and Lisa S. Simmons, of counsel), for other appellees.

JUSTICE BUCKLEY delivered the opinion of the court:

This appeal arises out of a medical malpractice action brought by Norma Bianchi, the special administrator of the estate of her husband, Edwin Bianchi, against Audrey Mikhail, the special administrator of the estate of Dr. Kamel A. Mikhail, and Dr. Mohammed E. Darwish. Plaintiff alleged that defendants were negligent in failing to recognize signs of the early stages of kidney disease in plaintiff's decedent. After a five-day trial, the jury returned a verdict for defendants. On appeal, plaintiff contends: (1) that the trial judge erred in denying a mistrial or granting other appropriate relief after defense counsel "ambushed" plaintiff's expert on cross-examination with incompetent evidence which defense counsel had failed to disclose in pretrial discovery; (2) that the trial judge erred when he disallowed plaintiff the opportunity to obtain an evidence deposition of plaintiff's expert to explain the unauthenticated, nondisclosed document the defendant had used to impeach plaintiff's expert; and (3) that the trial judge committed reversible error by failing to poll the entire jury on its first two "verdicts."

In January 1979, Edwin Bianchi (Bianchi) consulted Dr. Mikhail, his family physician, for colon and stomach problems. Dr. Mikhail diagnosed Bianchi as suffering from diverticulitis, or inflammation of the bowels. In February 1979, at the age of 65, Bianchi was admitted to MacNeal Hospital for an attack of diverticulitis. Routine urine and blood tests were taken at that time. The urine test showed that Bianchi's serum creatinine level was 1.9. Serum creatinine is a byproduct of muscle tissue which the kidneys remove from the blood. Plaintiff contends that a 1.9 level of serum creatinine in the blood is

abnormally high, illustrates a loss of kidney function and should alert a physician to the possibility of serious kidney problems. Dr. Mikhail did not inform Bianchi that he had possible kidney problems nor was he referred to a kidney specialist.

On October 1, 1980, Bianchi went to the hospital emergency room because he was unable to urinate. As a result, he was admitted for an obstructive uropathy which was caused by an enlarged prostate. Dr. Mikhail referred Bianchi to Dr. Darwish, a urologist. Dr. Darwish performed a transurethral resection on Bianchi in order to remove the obstruction. Subsequently, on October 7, 1980, Dr. Mikhail performed elective hernia surgery on Bianchi.

During his hospitalization, Bianchi's blood and urine were routinely checked on three separate occasions. Upon his admission, his serum creatinine level was 1.9. On October 3, 1980, his creatinine level had risen to 2.1 and on October 6, 1980, the level was 2.4. Bianchi was not informed of any possible kidney problems nor did Dr. Mikhail or Dr. Darwish consult a kidney specialist. After his discharge on October 14, 1980, Bianchi visited Dr. Mikhail on an outpatient basis. No tests for his serum creatinine level were done or ordered.

On November 2, 1980, Bianchi was readmitted to the hospital because he was vomiting and had an uncontrollable nose bleed. His serum creatinine level had jumped to 11.7 and he went into permanent renal failure. He was transferred to Loyola Hospital, where a renal biopsy was performed. The biopsy showed that Bianchi suffered from rapidly progressive glomerulonephritis (RPGN). RPGN is a fatal kidney disease which is only treatable if diagnosed early in its development.

Bianchi survived as a dialysis patient for the next 19 months. As a consequence of the disease, however, he suffered from numerous other health problems until his death on June 25, 1982.

At trial, defendants presented the testimony of Dr. Darwish, his expert Dr. Vincent J. O'Connor, Dr. Mikhail's expert Dr. Robert C. Muehricke, and the deposition testimony of Dr. Mikhail, who had died prior to trial. Dr. O'Connor testified that a normal creatinine level at Northwestern Memorial Hospital is 1.7. He stated he would not be concerned, however, by readings of 1.9 or 2.1. He further testified that, although 2.4 is "getting into a gray area," he would not be alarmed absent other signs of RPGN. Dr. Muehricke also described levels of 1.9 and 2.1 as normal in an aging kidney and that a level of 2.4 is only "slightly elevated." Both Dr. Darwish and Dr. Mikhail attributed the higher creatinine levels to Bianchi's age and the hardening of his arteries due to hypertension. In effect, all these

doctors reasoned that a person's kidney function decreases as a person gets older and thus his creatinine level will rise as a natural consequence of age. Consequently, normal creatinine levels in older people naturally will be higher than in younger people.

On the other hand, plaintiff's expert, Dr. Allen Arieff, testified that a normal range of creatinine in all adults will never rise above 1.4. He testified, therefore, that when Dr. Mikhail and Dr. Darwish saw that Bianchi's creatinine level was 1.9, they should have been alarmed and notified a specialist who could have begun early treatment of Bianchi's condition. According to Dr. Arieff, although it is true that the kidney function of a healthy person will naturally decline with age, this decline will be matched by a decline in muscle tissue. Therefore, since creatinine is a byproduct of muscle tissue, Dr. Arieff reasoned that a healthy adult's creatinine level will never rise above 1.4.

On cross-examination of Dr. Arieff, counsel for Dr. Darwish asked Dr. Arieff if he was on the staff of San Francisco General Hospital. After he responded that he was on the staff of all the University of California teaching hospitals, Dr. Darwish's counsel informed Dr. Arieff and the jury that the hospitals at which he is on staff show normal creatinine levels for people over 65 to be between .6 and 1.9. Dr. Darwish's counsel made this statement before defendant had introduced any evidence to prove this fact. At that point, counsel for Dr. Darwish had a book entitled "Clinical Laboratories Manual, July, 1988, San Francisco General Hospital" marked as defendant Dr. Darwish's exhibit number 2 for identification. While the book was being marked, the trial judge commented:

> "You can tell me when we're at a point to stop. The stuffiness is getting to me. I think you should show that to adverse counsel. Maybe we ought to take a break now."

At the suggestion of Dr. Darwish's counsel, the judge agreed to take a break after counsel had concluded his cross-examination of Dr. Arieff. Dr. Darwish's counsel then had Dr. Arieff open the book to a marked page. On that page, normal creatinine level ranges were listed for patients under 16 years of age, between 16 and 65 years of age, and over 65 years of age. The normal range for people over 65 was shown to be between .6 and 1.9. Dr. Arieff was clearly surprised and the only explanation he could come up with was that the manual had not been updated in a while.

A 10-minute recess was taken at this point in the trial. At no time did plaintiff's counsel object to the introduction of this book on the ground that he was not provided with it pursuant to his pretrial discovery request. He made no other motions at this time nor did he even mention the book in his redirect examination of Dr. Arieff.

The following morning plaintiff's counsel moved for a mistrial based on Dr. Darwish's counsel's failure to disclose before trial the laboratory manual from San Francisco General Hospital pursuant to plaintiff's Rule 237 notice to produce. (134 Ill. 2d R. 237.) Dr. Darwish's counsel stated that he did not believe that the laboratory manual fell within plaintiff's request. Plaintiff's counsel explained that the reason he did not object or make any other motions the day before when the manual was introduced and the cross-examination conducted was because he was "neutralized with shock." He also stated that he was "trying to hide the extraordinary effect that this book had on me." The trial judge denied the motion for mistrial on the grounds that the motion was untimely. Plaintiff then requested, since Dr. Darwish's counsel clearly violated discovery, that the portion of the cross-examination of Dr. Arieff where he was impeached with the laboratory manual be stricken from the record and that the jury be instructed to disregard it. The trial judge also denied this motion on the ground that it was untimely.

The following day, plaintiff's counsel again raised the issue of the laboratory manual. He stated that Dr. Arieff conducted an investigation of the laboratory manual upon his return to California, where he lived and practiced medicine. Plaintiff's counsel contended that Dr. Arieff discovered that the range of .6 to 1.9 did not apply to Bianchi, but only applied to bedridden patients in long-term care. In fact, the laboratory manual supported Dr. Arieff's testimony because it indicated that 1.4 was the highest level for normal, healthy patients. Plaintiff's counsel requested that he be able to take the evidence deposition of Dr. Arieff because he would be unable to return to Chicago to testify due to the fact that he was on call at his hospital. The trial judge stated that plaintiff could surely present additional witnesses, but that his request that a telephone evidence deposition be taken was denied. The judge stated that "the element of surprise was not overcome by a timely objection."

The case was sent to the jury on July 28, 1989. The jury returned with a verdict for defendants and plaintiff requested that the jury be polled. The first juror expressed some doubt about the verdict. The judge discontinued the poll after questioning only this juror and, over plaintiff's objections, sent the jury back to continue its deliberations. The jury again returned with a verdict in favor of defendants, but this same juror wrote "protest" next to her name on the second verdict form. The judge started the poll with this same juror who again expressed confusion. For the second time, the judge stopped polling the jury after questioning this juror and sent the jury back to continue its deliberations. While the jury was deliberating,

plaintiff made a motion for a mistrial on the grounds that the judge's conduct in focusing on this one juror was coercive. This motion was denied. The jury returned a third time with a verdict for defendants. The jury was polled and all jurors stated that the verdict was correct. The judge entered the verdicts. Plaintiff then made a motion for a new trial which was denied.

Plaintiff asserts that this case revolved around the sole issue of whether Bianchi's serum creatinine levels were normal or abnormally high. She maintains that had defense counsel complied with her Rule 237 discovery request prior to trial her expert would have known that the level of 1.9 in the San Francisco Hospital's laboratory manual was only "normal" for nonhealthy, bedridden, long-term care patients. She contends that "ambushing" her expert on cross-examination with the laboratory manual was so prejudicial that the trial judge erred in not granting her motion for mistrial.

Defendants contend that plaintiff has waived her objections to Dr. Arieff's cross-examination by failing to object during the cross-examination and by failing to call any other witnesses to explain the manual. Defendants also assert that plaintiff was not prejudiced by the judge's rulings and that the judge did not abuse his discretion. Defendants do not argue that Dr. Darwish's counsel did not violate discovery. Therefore, we assume that a discovery violation occurred and begin our analysis by determining whether plaintiff's objections to the cross-examination of Dr. Arieff were untimely.

Plaintiff's counsel asserts that he did not make an objection until the next morning because he was "neutralized with shock" and did not want to highlight the manual in front of the jury. Defendants contend that considerations of trial strategy do not excuse the failure to make a timely objection. Additionally, defendants maintain that plaintiff was not prejudiced by the use of the laboratory manual because plaintiff's counsel was able to view the manual before conducting his redirect examination of Dr. Arieff. We believe that plaintiff's objection was timely, that he was clearly prejudiced by defendants' discovery violation and use of the manual, and that the trial judge abused his discretion in denying plaintiff's motion for mistrial.

Defendants cite to numerous cases which stand for the proposition that a contemporaneous trial objection must be made in order to preserve perceived error. (See *Roberts v. Sisters of St. Francis Health Services, Inc.* (1990), 198 Ill. App. 3d 891, 556 N.E.2d 662; *Gonzalez v. Prestress Engineering Corp.* (1990), 194 Ill. App. 3d 819, 551 N.E.2d 793; *Gibson v. State Farm Mutual Automobile Insurance Co.* (1984), 125 Ill. App. 3d 142, 465 N.E.2d 689; *Walker v. Maxwell City, Inc.*

(1983), 117 Ill. App. 3d 571, 453 N.E.2d 917; *Vee See Construction Co. v. Luckett* (1981), 102 Ill. App. 3d 444, 430 N.E.2d 91; *Northern Trust Co. v. Winston* (1975), 32 Ill. App. 3d 199, 336 N.E.2d 543; *Bohannon v. Schertz* (1974), 21 Ill. App. 3d 149, 315 N.E.2d 316.) In all these cases, however, the party asserting the error failed to make any objection at all during the trial. Additionally, the question in these cases was whether the issue was waived for purposes of *review*, not whether the objection at trial, as in this case, was untimely and thus precluded the trial judge from taking any corrective action.

Only two cases cited by defendants warrant discussion. Both are distinguishable from the facts presented here. In *Lawing v. Chicago Transit Authority* (1986), 142 Ill. App. 3d 119, 491 N.E.2d 145, plaintiff sued the Chicago Transit Authority (CTA) for damages she allegedly sustained when she alighted from a CTA bus. Officer Lawrence Bartoli filled out a hospitalization case report of the accident at the time plaintiff was treated for her injuries. At trial, Bartoli was called as a defense witness and was told by defense counsel to refer to the report if he needed to refresh his memory. Bartoli then proceeded to testify to admissions plaintiff made to him at the hospital. On appeal, plaintiff asserted that the hospitalization report was inadmissible and that the use of it improperly prejudiced her case. The *Lawing* court held that plaintiff waived review of the issue by failing to make a timely objection. The court rejected plaintiff's assertion that she refrained from objecting because "she wished to avoid further prejudice." 142 Ill. App. 3d at 124.

The plaintiff in *Lawing*, however, failed to make any objection at all to the use of the report at trial and raised the issue for the first time in her motion for a new trial after a verdict was entered in defendant's favor. Additionally, unlike in the instant case, plaintiff presumably had access to the report prior to trial and conducted extensive cross-examination of Bartoli. Moreover, the *Lawing* court noted that, since there was no evidence in the record to support her allegation that defense counsel and Bartoli "waved" the report in front of the jury, the conduct of defense counsel and Bartoli was not so prejudicial that she was denied a fair trial.

In *Stein v. Burns International Security Services, Inc.* (1981), 102 Ill. App. 3d 776, 430 N.E.2d 334, plaintiff brought a negligent hiring action against defendant for injuries he sustained as the result of the conduct of defendant's employee. Plaintiff called Bishop John Kennelly of the Chicago Archdiocese to rebut evidence that plaintiff's present incapacity may have been the result of an automobile accident in which he was involved in 1972. The Bishop testified that he had often visited plaintiff at his place of business prior to the

incident in question and had never seen plaintiff exhibit the physical problems from which he now suffered. Prior to the Bishop's testimony, the trial judge granted a defense motion to prevent the Bishop from testifying to the fact that the reason he would visit plaintiff was because plaintiff always had clothes and other goods to be picked up as donations to charity. Three times during his testimony and twice during cross-examination, however, the Bishop mentioned plaintiff's charitable work. These comments were not solicited by either counsel, but were merely part of the Bishop's answers to general questions. Defense counsel made no objections or motions to strike.

On appeal, defendant claimed it was unfairly prejudiced by the Bishop's comments. Defendant admitted it did not object to the comments at trial, but alleged that, "if it had done so, greater prejudice would have occurred because an objection would have merely emphasized the improper comments." (102 Ill. App. 3d at 782.) Again, as in *Lawing* and unlike in the instant case, counsel made no objection at trial and thus waived review of the issue on appeal. Additionally, the *Stein* court concluded that, contrary to defendant's assertion, had defendant objected when the Bishop first commented on plaintiff's charitable works, "it could have avoided any possible repeat of such comments and could have avoided any possible prejudice caused by the comments." (102 Ill. App. 3d at 782.) Moreover, the *Stein* court noted that, notwithstanding waiver, the comments did not prejudice defendant or deny him a fair trial.

First, we do not believe that either of these cases supports defendants' claim that plaintiff's objection was untimely. In neither case was an objection made at any time during trial. We find persuasive and choose to follow the reasoning in *Kitsch v. Goode* (1977), 48 Ill. App. 3d 260, 362 N.E.2d 446. In *Kitsch*, plaintiffs brought a personal injury action against defendants to recover for injuries allegedly sustained in an automobile collision. In response to a general question on direct examination, plaintiff mentioned that he had insurance. After cross-examination of plaintiff, defendant asked to approach the bench. The *Kitsch* court noted that it was unclear whether defendant made his motion for mistrial on the grounds that insurance had been improperly disclosed before the jury at this moment or the next morning. The *Kitsch* court stated:

"It is not clear from the record whether the conference in chambers that ensued took place immediately, or the next morning, but in the view we take of the matter, the exact timing is immaterial. We think that the motion for mistrial was timely made, and that defense counsel properly handled his objection in such a way as not to overemphasize the remark about insurance before the jury." *Kitsch*, 48 Ill. App. 3d at 265, 362 N.E.2d at 450.

■ We agree with the *Kitsch* court and hold that plaintiff's motion for mistrial was presented in a timely manner. Additionally, we believe that the motion was timely because a contemporaneous objection would not have cured the prejudice and thus would have been futile. Before even introducing the laboratory manual into evidence and before any objection could have been made, Dr. Darwish's counsel introduced its contents into evidence. During cross-examination, Dr. Darwish's counsel had Dr. Arieff repeat that he was on the staff of San Francisco General Hospital and that the highest normal creatinine level he had ever seen was 1.4. Then, while holding up a mysterious red book which had never been disclosed to plaintiff's counsel, the following exchange took place:

"DR. DARWISH'S COUNSEL: That very hospital where you're on the staff, do you know that their lab values for creatinine increases for people over 65 years of age?

DR. ARIEFF: If that's true, I'll have to check into that.

DR. DARWISH'S COUNSEL: You don't have to check into it, I'll show you in a second doctor.

DR. ARIEFF: O'kay.

DR. DARWISH'S COUNSEL: Are you aware that they show for persons over 65 years of age the normal creatinine is 1.9?

DR. ARIEFF: I'd be both surprised and horrified if that were true."

As plaintiff's counsel stated, "the damage had been done." There was no way plaintiff could have counteracted this cross-examination without having reviewed the laboratory manual. We must reject defendants' argument that plaintiff was not prejudiced by this discovery violation because, prior to conducting his redirect examination, plaintiff's counsel was able to review the manual and confer with his expert during a court recess. We find unpersuasive the assertion that the 10-minute recess before plaintiff's redirect examination was a sufficient opportunity to digest what had just transpired in court and review a document which consisted of several hundred pages.

■ If counsel presents his adversary with a Rule 237 notice to produce, he has the right to assume that his opponent has complied. (*Lawson v. G.D. Searle & Co.* (1975), 29 Ill. App. 3d 670, 681, 331 N.E.2d 75, 82, *rev'd on other grounds* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.) Factors to consider when determining the propriety of a sanction for violating a Rule 237 notice include the surprise to the opposing party, the prejudicial effect of the evidence, the diligence of the opposing party in seeking discovery, timely objection to the evidence, and the good faith of the party offering the evidence. (*Hawk-*

*ins v. Wiggins* (1980), 92 Ill. App. 3d 278, 283, 415 N.E.2d 1179, 1182.) Whether to declare a mistrial rests within the sound discretion of the trial judge and will not be reversed on appeal unless that decision is a clear abuse of discretion. (*Topp v. Logan* (1990), 197 Ill. App. 3d 285, 296, 554 N.E.2d 454, 462.) However, a mistrial should be granted "when there is an occurrence of such character and magnitude as to deprive a party of a fair trial and the moving party demonstrates actual prejudice as a result." *Topp*, 197 Ill. App. 3d at 296, 554 N.E.2d at 462.

■ Considering the relevant factors above, we believe the trial judge abused his discretion when he refused to grant a mistrial. Plaintiff has clearly shown prejudice of such a character as to deprive her of a fair trial. The confrontation of plaintiff's expert with the laboratory manual completely nullified his testimony. Without a proper opportunity to have reviewed this manual, plaintiff was deprived of a fair opportunity to rehabilitate her witness.

Additionally, even if the trial judge did not abuse his discretion in denying plaintiff's motion for mistrial, he clearly abused his discretion in not allowing plaintiff the opportunity to rehabilitate her expert through the use of an evidence deposition. Plaintiff asserts that, by not allowing her to take the evidence deposition of Dr. Arieff, defendants were able to misrepresent the contents of the laboratory manual with impunity. Plaintiff contends that the laboratory manual actually supports plaintiff's case and shows 1.4 as the highest normal reading for an elderly, healthy and nonbedridden patient. Plaintiff asserts that a telephone deposition would have resulted in no trial delay and, if the parties were allowed to go to California to take the deposition, only a one-day delay would have resulted. Defendants contend that plaintiff waived this objection by failing to call other witnesses to explain the manual.

When a witness' credibility is crucial, the trial judge should permit the parties "wide latitude" in impeaching and rehabilitating that witness' credibility "so that the jury can gain access to all necessary information and impressions in order to evaluate credibility." (*People v. Morando* (1988), 169 Ill. App. 3d 716, 730, 523 N.E.2d 1061, 1072.) In the instant case, Dr. Arieff's testimony was absolutely "crucial" to plaintiff's case. Through the use of the laboratory manual, his testimony was completely contradicted by Dr. Darwish's counsel on cross-examination. Since the manual was not disclosed to plaintiff during discovery, plaintiff's counsel was unable to rehabilitate her witness with this same manual. Subsequently, after reviewing the manual, plaintiff allegedly discovered that the 1.9 level that Dr. Darwish's counsel directed Dr. Arieff to read actually applied

only to bedridden patients. Plaintiff contends that the manual actually instructs that 1.4 is the highest normal reading for nonbedridden patients like Bianchi. By failing to allow plaintiff to rehabilitate her witness through the use of an evidence deposition, the jury was denied "all necessary information and impressions in order to evaluate credibility." *Morando,* 169 Ill. App. 3d at 730, 523 N.E.2d at 1072.

We do not agree with defendants that plaintiff waived this contention because she could have called other witnesses to explain the manual. We do not believe that such a tactic could have successfully cured the prejudice caused by the impeachment of Dr. Arieff with the laboratory manual. Dr. Arieff was impeached and, therefore, plaintiff should have been given the opportunity to rehabilitate Dr. Arieff *with testimony from Dr. Arieff.* Moreover, we question whether anything short of the live testimony of Dr. Arieff could have cured this prejudice. In other words, we do not think that even an evidence deposition from Dr. Arieff would have been sufficient to correct the prejudice here.

■ Defendant Dr. Darwish asserts that, notwithstanding his discovery violation, no evidence was presented to show that his conduct was a proximate cause of plaintiff's injuries. He argues, therefore, that we should order the trial court to enter a directed verdict in his favor. We believe that the question of proximate cause should be left to the jury as fact finder in this case.

■ Defendant Dr. Mikhail argues that we should not reverse the jury verdict in his favor as a "sanction" for the misconduct during trial of Dr. Darwish alone. Since Dr. Darwish was the only one to commit misconduct, Dr. Mikhail asserts that his rights will be prejudiced if we reverse the verdict in his favor. Dr. Arieff's testimony on normal creatinine values was essential to plaintiff's case. Dr. Darwish's improper use of the laboratory manual prejudiced plaintiff's case against both defendants. Thus, we cannot separate the effect of the discovery violation and must reverse and remand for a new trial against both defendants.

Finally, plaintiff contends that the trial judge committed reversible error when he failed to poll the entire jury after the first juror expressed disagreement with the verdict. Plaintiff asserts that this had the effect of coercing the juror into agreeing with the verdict. Defendant maintains that a trial judge is not required to continue polling the jury after a juror states his disagreement with the verdict.

■ ■ The rules governing the polling process are the same in both criminal and civil trials. (See *People v. Rehberger* (1979), 73 Ill. App. 3d 964, 968, 392 N.E.2d 395, 398; *Ferry v. Checker Taxi Co.*

(1987), 165 Ill. App. 3d 744, 753, 520 N.E.2d 733, 739.) Before a verdict is accepted and recorded, the parties to the action have an absolute right to poll the jury as to whether each individual juror agrees with the verdict. (*Rehberger*, 73 Ill. App. 3d at 968, 392 N.E.2d at 398.) The purpose of polling a jury is to determine whether any individual jurors have been coerced by the other members of the jury into returning a certain verdict. (*Goshey v. Dunlap* (1973), 16 Ill. App. 3d 29, 34, 305 N.E.2d 648, 652.) Thus, when conducting the poll, the trial judge must be careful "not to hinder a juror's expression of dissent." (*Goshey*, 16 Ill. App. 3d at 34, 305 N.E.2d at 652.) In *People v. Kellogg* (1979), 77 Ill. 2d 524, 397 N.E.2d 835, the Illinois Supreme Court set forth the purpose and manner of conducting a jury poll. The *Kellogg* court stated:

"When a jury is polled, each juror should be questioned individually as to whether the announced verdict is his own. The poll should be conducted so as to obtain an unequivocal expression from each juror. (ABA Standards, Trial by Jury, sec. 5.5 (1968).) The very purpose of the formality of polling is to afford the juror, before the verdict is recorded, an opportunity for 'free expression unhampered by the fears or the errors which may have attended the private proceedings' of the jury room. (8 Wigmore, Evidence sec. 2355, at 717 (rev. ed. 1961).) In conducting the poll, each juror should be examined to make sure that he truly assents to the verdict. See Annot., 25 A.L.R.3d 1151 (1969).

The trial court may use its discretion in selecting the specific form of question to be asked in the polling process as long as a juror is given the opportunity to dissent. The double-barreled question used in this case, 'Was this then and is this now your verdict?' has often been used in Illinois. (See *People ex rel. Lane v. Pate* (1968), 39 Ill. 2d 115.) We see nothing wrong with using this question in polling the jury. However, if a juror indicates some hesitancy or ambivalence in his answer, then it is the trial judge's duty to ascertain the juror's present intent by affording the juror the opportunity to make an unambiguous reply as to his present state of mind. (*People v. Preston* (1979), 76 Ill. 2d 274.) Jurors must be able to express disagreement during the poll or else the polling process would be a farce and the jurors would be bound by their signatures on the verdict. Before the final verdict is recorded, a juror has the right to inform the court that a mistake has been made, or to ask that the jury be permitted to reconsider its verdict, or to express disagreement with the verdict returned. If the trial judge determines that any juror does dissent from the verdict submitted to the court, then the proper remedy is for the trial court, on its own motion if necessary, to either direct the jury to

retire for further deliberations (*Martin v. Morelock* (1863), 32 Ill. 485), or to discharge it (ABA Standards, Trial by Jury sec. 5.5 (1968)).

\*\*\*

In conducting the poll, the judge must keep in mind that the ' "influence of the trial judge on the jury is necessarily and properly of great weight" ' and that 'jurors are ever watchful of the words that fall from him.' (*Bollenbach v. United States* (1946), 326 U.S. 607, 612, 90 L. Ed. 350, 354, 66 S. Ct. 402, 405.) Thus the judge, in posing questions to a juror during the poll, must carefully avoid the possibility of influencing or coercing the juror." (77 Ill. 2d at 527-29.)

In *People v. Chandler* (1980), 88 Ill. App. 3d 644, 411 N.E.2d 283, the appellate court addressed the exact issue presented in the instant case. In *Chandler*, the trial judge continued the poll of the entire jury after the third juror dissented from the verdict. Defendant argued that this was prejudicial because it isolated the dissenting jurors and resulted in pressure from the judge. Defendant contended that the judge should have immediately sent the jury back to continue deliberations because "there was no purpose in continuing the poll once one dissenting juror was discovered and the possibility of harm to defendant was great."

Following the above-quoted reasoning from the supreme court's decision in *Kellogg*, the *Chandler* court rejected defendant's argument. The *Chandler* court stated:

"No court in this State has ever held that it is error to continue the poll after discovering a dissenting juror, nor is the questioning of the dissenter improper of itself. *On the contrary, it is apparent that the trial court has the duty to continue the poll and to fully inquire of each juror as to whether he concurs in or dissents from the verdict.*" (Emphasis added.) *Chandler*, 88 Ill. App. 3d at 649, 411 N.E.2d at 288.

In support of their assertion that it is not improper for the trial judge to discontinue the poll after the first dissenting juror is discovered, defendants cite *People v. Lark* (1984), 127 Ill. App. 3d 927, 469 N.E.2d 728. In *Lark*, the trial judge apparently discontinued the poll and excused the jury to continue to deliberate after the first juror disavowed the guilty verdicts. After further deliberations, the jury again returned guilty verdicts and each juror acknowledged the verdicts. The *Lark* court upheld the jury verdicts. In *Lark*, however, the issues presented for review were whether the judge erred in failing to give a deadlock instruction and whether he abused his discretion by directing the jury to redeliberate. Defendant in *Lark* never argued that the judge erred because he discontinued the poll after the first juror dissented.

■ Therefore, following the decisions in *Kellogg* and *Chandler*, we hold it was error for the judge to twice discontinue the jury poll and excuse the jury to continue its deliberations as soon as he discovered that the first juror was equivocal about his verdict. This conduct effectively isolated the juror and conceivably could have had a coercive effect.

Consequently, for all the above-stated reasons, the verdict against plaintiff and for defendants is reversed and the case remanded for a new trial.

Reversed and remanded.

CAMPBELL, P.J., and O'CONNOR, J., concur.