2020 IL App (1st) 191638-U

THIRD DIVISION
October 21, 2020

No. 1-19-1638

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| REBECCA PINEIRO, as Personal Representative of the Estate of Antonio Pineiro, Deceased, | ) )  ) | Appeal from the Circuit Court |
| Plaintiff-Appellant, | ) ) | of Cook County |
| v. | ) ) | 2016-L-000050 |
| ADVOCATE HEALTH AND HOSPITALS CORPORATION, MAXIME GILLES, M.D., EVAN McLEOD, M.D., and KAMBIZ ZORRIASATEYN, M.D., | ) ) ) ) | Honorable Janet Adams Brosnahan, Judge Presiding |
| Defendants-Appellees. | ) ) | |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Burke concurred in the judgment.

O R D E R

¶ 1 *Held*: In medical malpractice appeal, plaintiff failed to show that trial court coerced juror into a unanimous verdict and plaintiff waived all other arguments by failing to comply with appellate rules.

¶ 2 Antonio Pineiro arrived at Chicago's Advocate Trinity Hospital complaining of shortness of breath and pleuritic chest pain and then died at the hospital 28 hours later from septic shock. Plaintiff Rebecca Pineiro, on behalf of her husband's estate, brought medical negligence claims against Advocate Health and Hospitals Corporation (Advocate Health), board-certified emergency

medicine physician Dr. Maxime Gilles, board-certified internist Dr. Kambiz Zorriasateyn, and pulmonologist Dr. Evan McLeod, alleging that the physicians delayed in diagnosing and treating sepsis. The plaintiff appeals after a jury verdict was entered in favor of all of the defendants. The plaintiff's primary argument on appeal is that the trial judge coerced a holdout juror into changing her vote, instead of declaring a mistrial. The plaintiff further contends that her post-trial motion should have been granted as it identified numerous evidentiary errors, as well as the use of a pattern jury instruction which mischaracterized the three defendant physicians as "specialists." The defendants respond that the trial proceeded without error and that despite the physicians' compliance with the standard of care, Mr. Pineiro's death was predetermined by an aggressive MRSA infection. (MRSA is an acronym for Methicillin-resistant Staphylococcus aureus and refers to a group of bacteria that cause infections that are difficult to treat in humans). The defendants also contend the plaintiff has waived most of her appellate arguments by failing to support them with the necessary citations to the record and authority.

¶ 3 The trial court entered a final judgment order on March 14, 2019, the plaintiff filed a post-judgment motion on April 15, 2019, the court denied the motion on July 12, 2019, and the plaintiff filed a notice of appeal on August 9, 2019. Accordingly, we have jurisdiction pursuant to Supreme Court Rule 301 (eff. Feb. 1, 1994) and Supreme Court Rule 303 (eff. July 1, 2017).

¶ 4 We have compiled the following summary of the three-week jury trial and limited this recitation to the essential evidence and procedural facts.

¶ 5   The record shows that in January 2014, Mr. Pineiro was a 54-year-old man with a history of uncontrolled diabetes, high blood pressure, and heart issues, including four coronary artery stents, the most recent of which had been placed in early 2012. He had been ill for about a week

before asking his wife to take him to the emergency room. At about 1:30 a.m., on Saturday, January 4, 2014, the Pineiros arrived at Advocate Trinity Hospital, which was an "average-sized community hospital" close to their home. After initial testing to rule out a coronary issue or a pulmonary embolism, Dr. Gilles correctly diagnosed Mr. Pineiro with community-acquired pneumonia and ordered the administration of fluids and antibiotics. Dr. Gilles ordered Rocephin/ceftriaxone and Zithromax/azithromycin, which were two broad-spectrum antibiotics that were the most common treatment for community-acquired pneumonia.

¶ 6 Although Dr. Gilles' work shift ended at 6 a.m., he continued to treat Mr. Pineiro for an additional 90 minutes. He called Mr. Pineiro's primary care physician, Dr. Debra Damper, and was put in touch with a physician who was covering for Dr. Damper, Dr. Wanda Pearson. As an emergency department physician, Dr. Gilles could not admit a patient to another department of the hospital. At 7:11 a.m., Dr. Pearson admitted Mr. Pineiro to the hospital's telemetry unit and she and another physician in the Damper practice group, Dr. Melinda Sykes-Bellamy, were then in charge of Mr. Pineiro's care at Advocate Trinity Hospital as his attending physicians. Dr. Gilles testified that an attending physician manages a patient's hospital care by, for instance, ordering antibiotics, blood work, fluids, oxygen, x-rays, and consultations. Thus, Dr. Gilles testified, an emergency room physician such as himself "get[s] them in the door and then they [(the attending physicians)] take over." The telemetry unit that Dr. Giles and Dr. Pearson discussed would provide continuous monitoring, in contrast to the lesser extent of monitoring provided on a medical floor of the hospital.

¶ 7 Mr. Pineiro "boarded" in the emergency department for 10 hours, meaning that after he was admitted to the hospital, he remained in the emergency department while waiting for a hospital

bed to become available. Throughout this time period, he remained in a room and connected to the same monitoring equipment that would have been used in the telemetry unit. The emergency department monitored his heart, respiration, oxygenation, temperature, as well as blood pressure, all of which remained normal and stable. While boarding, Mr. Pineiro was seen only by nurses and by a respiratory therapist who administered breathing treatments.

¶ 8 On Saturday afternoon, at about 2:00 p.m., Mr. Pineiro's attending physician, Dr. Sykes-Bellamy, ordered the use of biPAP equipment, however, Mr. Pineiro's condition deteriorated over the course of the day. The nurses documented that the "patient refused to keep the biPAP on" and the "respiratory [therapist] had difficulty convincing the patient to use the biPAP." Dr. Zorriasateyn testified that biPAP is the use of a respiratory support machine that delivers oxygen under positive pressure and that some people are uncomfortable in a biPAP mask.

¶ 9 Sometime after 4 p.m., Dr. Sykes-Bellamy changed the bed request from the telemetry unit to the transitional care unit or TCU, which was a level of care that was considered a "step down" from the intensive care unit or ICU. Mr. Pineiro transferred out of the emergency room into the TCU at about 5:45 or 6 p.m.

¶ 10 Mr. Pineiro was having difficulty breathing and a rapid response code was called. Dr. Zorriasateyn was an "urgent hospitalist" at Advocate Trinity Hospital, which meant that he responded to emergencies, rapid response codes, and Code Blues on the medical floors of the hospital, which were the three uppermost floors of the four-story building. Dr. Zorriasateyn was not on call in the emergency department, which was on the ground floor.

¶ 11 When Dr. Zorriasateyn conducted his first examination, he heard crackling in Mr. Pineiro's lungs which was inconsistent with pneumonia, rather, the sound was indicative of pulmonary

edema, or fluid in the lungs, which could cause suffocation. At about 6:30 p.m., he gave Mr. Pineiro a small dose of Lasix, 20 milligrams–much less than the 60 to 80 milligrams that would be given to an average size person–in order to give Mr. Pineiro relief and help diagnose what was occurring. Dr. Zorriasateyn also ordered immediate lab tests, a repeat chest x-ray, and the same two antibiotics that Dr. Gilles had ordered in the emergency room, Rocephin/ceftriaxonen and Zithromax/azithromycin. While testifying, the plaintiff admitted that Dr. Zorriasateyn talked with her and her husband about the importance of the breathing treatments and biPAP and that Dr. Zorriasateyn wanted to intubate Mr. Pineiro because he was having so much trouble breathing. Intubation, however, requires forcibly placing a tube down the patient's throat and must be consented to by the patient or by a family member if the patient is unable to give consent. The emergency room nurses had written in Mr. Pineiro's chart, "Spouse repeatedly states, no intubation" and "Spouse visibly upset." Dr. Zorriasateyn could recall his concern that the Pineiros were resisting the biPAP and that without sufficient oxygen, his patient was deteriorating. Dr. Zorriasateyn decided to persist in the conversation with his patient because if he became unable to give consent, then "who's going to give *** authority to intubate." The plaintiff testified somewhat to the contrary that although her husband did not like the biPAP, he kept it on for the 30 minutes that he was told to use it. Even with the biPAP in use at about 6 p.m, Mr. Pineiro's vital signs continued to deteriorate. Dr. Zorriasateyn ordered a bolus (the rapid administration of one liter) of fluid to help increase Mr. Pineiro's blood pressure. Dr. Zorriasateyn's 12-hour shift ended at 7 p.m., but he continued to treat Mr. Pineiro in the TCU. By 7:15 p.m., Dr. Zorriasateyn had received consent and resorted to intubation. During the intubation procedure, he suctioned out clots and bloody material from Mr. Pinero's airways and then used a nasogastric tube to suction "coffee

ground" material from Mr. Pineiro's stomach, which was potentially blood. Dr. Zorriasateyn then consulted Dr. McLeod, the defendant pulmonologist, by phone, who recommended that Mr. Pineiro be kept intubated and transferred to the ICU for observation.

¶ 12 In the ICU, Dr. Zorriasateyn placed a central line with the plaintiff's consent and ordered Vancomycin, which is an antibiotic used to treat MRSA pneumonia. However, Mr. Pineiro's 6:30 p.m. lab results showed a white blood cell count of 2.1, which Dr. Zorriasateyn testified was so low, it indicated that Mr. Pineiro's immune system had "give[n] up" fighting the "very advanced infection." Dr. Zorriasateyn testified this condition, leukopenia, occurs especially when a person has an underlying immune system problem such as uncontrolled diabetes. The defendants' infectious disease expert witness, Dr. John Segreti, testified that Mr. Pineiro's medical records indicated that by 6:37 p.m., four of his organ systems were involved and that the mortality rate for this state is "80 to 90 percent." Mr. Pineiro continued to decline. On Sunday morning, January 5, 2014, at 5:28 a.m., Mr. Pineiro died as a result of septic shock and multiorgan system failure caused by his body's overwhelming response to necrotizing MRSA pneumonia.

¶ 13 In 2016, the plaintiff filed her original medical negligence complaint and it was her fourth amended complaint that proceeded to trial. She alleged that her husband's initial clinical presentation at Advocate Trinity Hospital's emergency department "was consistent with respiratory failure and septicemia, requiring intravenous broad-spectrum antibiotics, and transfer to another medical facility for the purposes of stabilizing and treating his emergency medical condition, and necessitating a bronchoscopy." She alleged that none of the treating physicians (*i.e.*, Dr. Gilles and Dr. Zorriasateyn) ordered the necessary antibiotics until 19 hours later, when Dr. Zorriasateyn finally appreciated that Mr. Pineiro's condition was worsening. She alleged that Dr.

McLeod, the pulmonologist, repeatedly failed to respond to pages from the other physicians and then resisted their suggestion that Mr. Pineiro needed a bronchoscopy and to be transferred to another medical facility. She argues on appeal that the trial judge made a number of evidentiary errors and coerced a holdout juror into making the verdict unanimous.

¶ 14 During the three-week jury trial that was conducted in early 2019, the plaintiff presented testimony from Dr. Gilles, Dr. Zorriasateyn, Dr. McLeod, and the doctor who treated Mr. Pineiro on the morning that he died, Dr. Lizhu Gao. She also called three nurses, Tania Martinez, Gilberte Jean, and Lauren Hickey. The plaintiff and three family members gave additional testimony. Her medical experts were Dr. Mitchell Levy, a board-certified intensivist (critical care or ICU doctor) from Providence, Rhode Island; and Dr. Fred Joseph Simon, Jr., a general surgeon, trauma, and critical care doctor who was primarily practicing surgery in southern California. The plaintiff did not offer any testimony from a specialist in infectious disease and did not offer evidence concerning the nature of Mr. Pineiro's infection or his body's response. The following is a summary of what Dr. Levy and Dr. Simon related to the jury.

¶ 15 Dr. Levy testified that 50% of hospital deaths are sepsis related and that sepsis is the most common cause globally of death in the ICU. Also, 75% of the severe sepsis or septic shock patients in North America's ICUs are there because of pneumonia. Only about 10% of community-acquired pneumonia patients have MRSA. Dr. Levy was one of the founding members in 2002 of the Surviving Sepsis Campaign which aims to quickly bring research to bedside practice. Mr. Pineiro's initial blood tests in the emergency room showed that his lactate level was in the lower limits of normal. Dr. Levy opined from his perspective as an intensivist that Dr. Gilles should have then ordered an additional blood test to determine whether Mr. Pineiro was becoming acidotic from

sepsis and needed to be treated with more fluids and antibiotics. When sepsis is suspected, lactic acid should be measured to determine the severity of the illness. A patient with low blood pressure or high lactate should be given between two and four liters of fluids within three hours. Dr. Gilles timely administered fluids, but not enough fluids. Dr. Levy also opined that it was improper for Dr. Zorriasateyn to have administered a small dose of Lasix, a diuretic, to a patient who needed fluids; and that Dr. Zorriasateyn's administration of fluids and Vancomycin to address Mr. Pineiro's infection was about two hours late. Each hour of delay in administering the Vancomycin increased the risk of death by 5-to-10-percent.

¶ 16 In his role as a critical care doctor, Dr. Levy was assisting emergency department personnel in managing their sepsis patients, but he acknowledged that he had no training or experience as an emergency room physician or urgent hospitalist and no training in infectious disease, and he conceded that Dr. Gilles correctly diagnosed and appropriately treated Mr. Pineiro's community-acquired pneumonia in the emergency room. Dr. Levy also conceded that Dr. Zorriasateyn had ordered the administration of Vancomycin, an antibiotic that requires 24-to-48 hours to take effect. Dr. Levy acknowledged that when he was deposed, he agreed when the plaintiff's attorney defined the standard of care as what a reasonably well-qualified physician would do in like or similar circumstances. In his trial testimony, however, Dr. Levy was defining the standard as adherence to the minimum levels of the established best practice models, including the surviving sepsis campaign guidelines which Dr. Levy had co-authored. Dr. Levy acknowledged that the guidelines had been published with the express statements that they were only strong recommendations or goals for clinical practice and were not a standard of care. He also acknowledged that the guidelines suggested a course of care that many clinicians had disagreed with. In addition, Dr.

Levy's opinion that a lactic acid test was within the standard of care was contrary to the opinion he gave to help defend a doctor in a different suit. In that other suit he said "lactate is a very imperfect test, which is why I completely understand the field's reluctance to widely accept lactate levels," and that it was common for "really good clinicians to not use [that test] in any way."

¶ 17 Dr. Levy's testimony was about Dr. Gilles and Dr. Zorriasateyn and did not concern Dr. McLeod.

¶ 18 Dr. Simon opined from his perspective as a general surgeon that the medical records and physician depositions indicated that Dr. Gilles left Mr. Pineiro "boarding" in "limbo" only in the care of emergency room nurses who phoned for a hospitalist to come evaluate Mr. Pineiro while he deteriorated. More specifically, a nurse's note at 4:42 p.m. indicated a hospitalist had been notified that Mr. Pineiro had now been admitted for hypoxia and was awaiting a "step down" bed, his temperature was 100.3 degrees, his breathing was rapid, the biPAP had been discontinued for an unspecified reason, and the respiratory therapist was at the patient's bedside. A note made 15 minutes later at 4:59 p.m. indicated an emergency room nurse had contacted a step down unit nurse and that the respiratory therapist had been notified to bring another nebulizer to administer the medication that Mr. Pineiro was receiving to improve his airway.

¶ 19 Chest x-rays are usually taken only daily, but Dr. Zorriasateyn asked for a second x-ray within 90 minutes. The radiologist's note at 8:05 p.m. indicated Mr. Pineiro's lungs had bilateral opacity which was similar or slightly worse to his exam 90 minutes earlier, he had diffuse alveolar bleeding, and he was coughing up blood. The radiologist also noted that a bronchoscopy "can be performed for confirmation." A bronchoscope is a fiberoptic camera which has a small suction catheter. According to Dr. Simon, "if you read into this and if you've worked long enough, you

understand what the radiologist is telling you, that this is something he feels is beyond pneumonia." Dr. Simon opined that Dr. McLeod failed to timely respond to pages related to Mr. Pineiro and should have come to the hospital to provide care, including a bronchoscopy, on the evening of January 4, 2014. Dr. McLeod was sent a stat page (a request for a quick response) by the TCU at 8:01 p.m., a second page at 8:29 p.m., and a third page at 9:01 p.m. Dr. McLeod testified 1) he did not receive the first two pages, but he did receive the 9:01 p.m. page, 2) he responded at 9:07 p.m. and spoke to Dr. Zorriasateyn for approximately seven minutes, and 3) he then immediately called his paging service and, at Dr. McLeod's request, the service issued a test page at 9:18 p.m. Although Dr. Simon maintained it was a deviation from the standard of care for Dr. McLeod to fail to respond to the 8:01 p.m. page until 9:01 p.m., Dr. Simon acknowledged that the records did not reflect that Dr. Zorriasateyn asked Dr. McLeod to come to the hospital or that Dr. Zorriasateyn advocated for a bronchoscopy. When Dr. Simon worked as a clinical consultant for a naval hospital for 22 years, he spoke with a physician's assistant by phone instead of going to the facility 90 minutes away to see the patients himself.

¶ 20 Dr. Simon also opined that it was universal for a hospital to have a sepsis protocol and that it was a breach of the standard of care for Advocate Trinity Hospital to fail to have one. The protocol should have consisted of recognition, resuscitation (treatment), cultures, and antibiotics.

¶ 21 Dr. Simon agreed that Mr. Pineiro had community-acquired MRSA pneumonia. He agreed that a bronchoscope does not treat pneumonia but said a pulmonologist could have used one in the ICU to suction Mr. Pineiro's airway while he was intubated. A bronchoscope has a smaller suction catheter than the suction catheters that were used by the respiratory therapist and nurses who treated Mr. Pineiro. Dr. Simon conceded that the American College of Surgeons states that

physician expert witnesses should be actively involved in the clinical practice of the specialty or subject matter of the case at the time of the alleged occurrence; that he was a surgeon; and that he had no specialized training in infectious disease, internal medicine, or pulmonary medicine.

¶ 22 The defense called four board-certified experts. Advocate Health, Dr. Gilles, and Dr. Zorriasateyn called 1) Dr. John Segreti, an infectious disease doctor practicing in Chicago; 2) Dr. Kayur V. Patel, an emergency room physician and administrator working in Terra Haute, Indiana; and 3) Dr. Gaurav Chaturvedi, an internist and academic working in Chicago and its suburbs. The other defendant, Dr. McLeod, called Dr. Edward Garrity, a pulmonologist practicing in Chicago. The three defendant physicians (Drs. Gilles, Zorriasateyn, and McLeod) all also individually testified that they met the applicable standards of care.

¶ 23 Dr. Segreti explained that community-acquired pneumonia is the type acquired outside of a healthcare setting. MRSA pneumonia is the pneumonia caused by a type of staph aureus that is more resistant to the antibiotics used to treat typical pneumonia. Hospital-acquired MRSA pneumonia is not uncommon, but community-acquired MRSA pneumonia is "extremely rare" and Dr. Segreti saw only one such patient a year or every other year in his infectious disease practice. The incidence of community-acquired pneumonia that was caused by MRSA is only somewhere between 1% and 5%, depending on the literature (far less than the 10% figure given by the plaintiff's expert, Dr. Levy) and the incidence is not higher in urban areas like Chicago. Community-acquired MRSA pneumonia is also very aggressive. In addition, community-acquired MRSA pneumonia is difficult to identify, as it initially presents the same way every other community-acquired pneumonia presents. It would not have been apparent that Mr. Pineiro had MRSA pneumonia when he arrived at the emergency room. It is only through cultures, which

usually take 24-to-48 hours to grow, that the specific organism can be identified.

¶ 24 Pneumonia will progress differently depending on the type of bacteria causing the infection and the patient's physical response to the infection. Some MRSA bacteria produce toxins, which are proteins released into the body that cause damage to tissue. Vancomycin, an antibiotic used to treat MRSA bacteria, kills the bacteria, but cannot stop the toxins it produces, and those toxins continue to spread unless and until the body is able to clear them. Moreover, some patients have an abnormal, overwhelming response to a bacterial infection that can lead to sepsis, which is a response that causes organ damage.

¶ 25 In Dr. Segreti's opinion, the appropriate treatment for Mr. Pineiro's MRSA pneumonia was fluids, antibiotics, and mostly time for the antibiotics to work and time for his body to repair MRSA's damage. Dr. Zorriasateyn had testified that he gave an oral order for Vancomycin at about 7:15 p.m., after seeing the blood when he intubated Mr. Pineiro (the written order was entered later that night and the drug was administered after that). Vancomycin is not routinely ordered for community-acquired pneumonia because of its potential for kidney damage, but it is ordered when there is a "very high suspicion for MRSA."

¶ 26 Dr. Segreti opined that the blood Dr. Zorriasateyn saw during the intubation was from lung tissue that had been destroyed by MRSA. Antibiotics are unable to penetrate dead tissue well and Vancomycin cannot get into lungs very well. It was Dr. Segreti's opinion that even if Mr. Pineiro had been given Vancomycin on the morning he presented in Advocate Trinity Hospital's emergency department, it would not have made a difference to his outcome or prevented his death, because Mr. Pineiro had an abnormal response to aggressive MRSA pneumonia, and the toxins and bacteria spread faster than the Vancomycin could have had an effect. Vancomycin cannot stop

toxin production and it takes 24-to-48 hours to work, during which time the toxins are still being produced. In addition, Mr. Pineiro had positive blood cultures, meaning that the bacteria had spread from his lungs into his bloodstream. In Dr. Segreti's opinion, the toxins, which were smaller than the MRSA bacteria, had spread into Mr. Pineiro's bloodstream before the bacteria, causing organ damage. Also, Mr. Pineiro's illness had progressed very rapidly. While in the community, he could have caught a respiratory tract virus first, which would have made him more susceptible to catching the bacterial infection, and he could have had MRSA for less than 24 hours before arriving at the emergency room. Dr. Segreti further opined that a lactic acid test would not have improved Mr. Pineiro's chance of survival because it would not have helped determine his therapy. A patient's lactic acid number comes down when they receive fluids and antibiotics, and Mr. Pineiro's number did come down, but he still died. The records indicated that Dr. Zorriasateyn's administration of Lasix at 6:31 p.m. had only a temporary effect on Mr. Pineiro's blood pressure and other signs. Mr. Pineiro showed signs of going into septic shock later, when the administration of fluids was no longer enough to maintain his blood pressure.

¶ 27 Dr. Segreti acknowledged that if a patient's condition worsened rather than improved, as Mr. Pineiro's condition was doing by about 6 or 6:30 p.m. on Saturday, Dr. Segreti would broaden the antibiotic treatment (which is what Dr. Zorriasateyn had done). Also, if a patient was going into septic shock, Dr. Segreti would give Vancomycin as soon as it was feasible (which is what Dr. Zorriasateyn had done). Dr. Segreti believed that Mr. Pineiro was put on maintenance fluids before he got to the TCU, even though fluids were not in his chart, because maintenance fluids are typically provided, not all doctors and nurses document maintenance fluids, and, Mr. Pineiro's medical record reflected that, at the time, he was maintaining his own blood pressure and eating a

little. Dr. Segreti disagreed with the idea that Mr. Pineiro became hypotensive because he was not receiving enough fluids and testified that actually Mr. Pineiro became hypotensive when he went into septic shock. Going into septic shock caused his blood vessels to dilate and, at that point, not even the 5.155 liters of fluid he received between 11 p.m. and 7 a.m. was sufficient to maintain his blood pressure. Dr. Segreti also disagreed that Mr. Pineiro's lactic acid reading of 5.9 at 6 p.m. indicated that prior to 6 p.m. he was not getting enough oxygen to his tissues, and explained that a lactic acid test is essentially a snapshot of what is occurring when the test is taken. Dr. Segreti agreed that there was treatment that could stop the production of new toxins from a MRSA infection, but said there was nothing that could be done to clear the toxins that had already been released and protect the organs from damage.

¶ 28 Dr. Patel, a board-certified emergency room doctor and board-certified internist with extensive experience in hospital administration, testified that in January, 2014 there was no consensus regarding a sepsis protocol; there was no consensus regarding how to identify, treat, or recognize sepsis; and the standard of care at the time did not require a hospital to have a sepsis protocol. Individual clinicians used their judgment and expertise and in January 2014, Advocate Trinity Hospital met the standard of care regarding sepsis. It was not until October 2015, nearly two years after Mr. Pineiro's death in January 2014, that guidelines regarding sepsis were published by CMS, which is a very influential organization in the U.S. healthcare system. However, new information continues to come out and even today the diagnosis of sepsis is debatable. The diagnosis can be made based on a variety of factors, including clinical presentation and laboratory tests. Lactic acid can be raised or lowered by about 30 different conditions, so a lactic acid number would not be essential in making a diagnosis of sepsis. It would be just one of

the puzzle pieces, to be considered and weighed in the context of the patient's other signs and symptoms.

¶ 29 Dr. Chaturvedi, a hospitalist, opined that within a reasonable degree of medical certainty, Dr. Zorriasateyn met the standard of care in that he provided the right antibiotics, the right care, and did nothing to cause or contribute to cause Mr. Pineiro's death. The patient had a cardiac history, presented to the hospital with chest pain, and had developed difficulty breathing and fluid in his lungs, which suggested that he was deteriorating because of cardiogenic shock. The small dose of Lasix that Dr. Zorriasateyn gave Mr. Pineiro during the rapid response effort did not lead to septic shock. If the Lasix had actually caused Mr. Pineiro's blood pressure to drop as Dr. Levy had told the jury, then the patient's heart rate would have also changed. It was the overwhelming infection that caused Mr. Pineiro to become hypotensive. The Lasix should have increased Mr. Pineiro's urine output for six hours, but he produced only 300 milliliters between 3 p.m. and 11 p.m., and only 100 milliliters between 11:00 p.m. and 7:00 a.m., which was one of the indications that multiple organs were failing. The lab tests that Dr. Zorriasateyn ordered which were collected at 6:30 p.m. gave additional indications of a severe infection. Dr. Levy had testified that Dr. Zorriasateyn gave insufficient fluids, but Mr. Pineiro's response to the bolus of fluid that Dr. Zorriasateyn ordered said otherwise. Dr. Levy had also told the jury that Dr. Zorriasateyn deviated from the standard of care by not ordering Vancomycin stat (administered immediately), but in Dr. Chaturvedi's opinion, it was appropriate for Dr. Zorriasateyn to order it for the pharmacy to dose the proper amount because the lab results indicated Mr. Pineiro's kidney function was elevated and a regular dose of Vancomycin could cause kidney damage. The order was given during a rapid response resuscitation, which meant the pharmacy would deal with it as a stat order and push it to

the top of the queue. Mr. Pineiro received the Lasik in the ICU at 11 p.m., and in Dr. Chaturvedi's opinion, receiving it earlier would not have made a difference in the patient's outcome. Mr. Pineiro's lab results indicated it would be difficult for him to survive the overwhelming infection. The cultures came back within 3 hours, rather than 24-to-48 hours, meaning that the bacteria grew very rapidly.

¶ 30 The last expert, Dr. Garrity, testified from his perspective as a pulmonologist that nothing in the medical records indicated that Dr. McLeod was asked or required to come to the hospital during the afternoon of January 4, 2014. There was also no need for Dr. McLeod to come to the hospital to consult with Dr. Zorriasateyn and evaluate Mr. Pineiro after the 9:01 p.m. telephone discussion. Dr. Garrity opined that a bronchoscopy was not indicated here, given that it could interfere with Mr. Pineiro's breathing and it would not help treat necrotizing pneumonia. It was Dr. Garrity's opinion that Dr. McLeod properly fulfilled his obligations as a pulmonary consultant in this case, and in no way caused or contributed to cause Mr. Pineiro's death.

¶ 31 The plaintiff asked the jury to conclude 1) that Advocate Trinity Hospital was negligent by failing to have a sepsis protocol, 2) that Dr. Gilles and Dr. Zorriasateyn were negligent by failing to diagnose and treat sepsis by ordering a lactic acid test and sufficient fluids and by administering the diuretic Lasix which put Mr. Pineiro into septic shock, and 3) that Dr. McLeod was negligent by failing to participate in the diagnosis and treatment of sepsis and by failing to come to the hospital to perform a bronchoscopy.

¶ 32 The following facts pertain to the plaintiff's principal argument on appeal that the trial judge isolated and coerced one of the 12 jurors into a unanimous verdict. On Tuesday, March 12, 2019, after closing arguments, the trial judge instructed the jury and handed the case over for

1-19-1638

deliberation beginning at 1:17 p.m. The jury continued to deliberate for the remainder of that afternoon, until 5:00 p.m., and returned for further deliberations. At about 1:30 p.m. on the second day, the jury sent two notes to the trial judge. One note said: "We are gridlocked at 11 to 1. We have tried persuading said person, but there is a refusal to listen to the law." The second note said: "If I've reached my decision and the 11 won't rest it, yet continue to try and sway my decision, at what point can this end?" The trial judge informed the litigants of the jury's notes and, without objection, gave Illinois Pattern Jury Instructions, Civil No. 1.05 (3rd ed. 1995), which is the deadlocked jury instruction that was suggested by the Illinois Supreme Court in *People v. Prim*, 53 Ill. 2d 62, 289 N.E.2d 601 (1972).

"THE COURT: Please have a seat.

Ladies and gentlemen, I have received both of the notes and I'm now going to instruct you further.

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it.

Your verdict must be unanimous. It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment.

Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But, do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your

- 17 -

fellow jurors or for the mere purpose of returning a verdict. You are not partisans. You are judges–judges of the facts. Your sole interest is to ascertain the truth from the evidence in this case.

I'm going to give you a copy of this instruction to take back with you into the deliberation room. Please continue to deliberate."

¶ 33 The jury resumed deliberations until just after 5:00 p.m. The following morning, Thursday, March 14, 2019, shortly before the jury was scheduled to reconvene at 10:00 a.m., the trial court received a jury note at 9:34 a.m. This third jury note stated:

"Your Honor, I am experiencing elevated blood sugar levels and chest pain due to the stress of this deliberation. Please help. I believe that we/they all do not understand that if 1 person has her/his own opinion and can stay with that [as] her/his decision then we can come out and say that. 'They' say he/she cannot come out until this 'one' person agrees w/them, otherwise we would have been done yesterday after 4 hours."

¶ 34 After advising counsel of the note, the trial judge proposed reading the jury the second *Prim* instruction, Illinois Pattern Jury Instructions, Civil No. 1.06 (3rd ed. 1995). The plaintiff's counsel requested a mistrial or the second *Prim* instruction. The trial judge said it was premature to declare a mistrial until after the jury heard the second *Prim* instruction. The judge suggested that she also reread the cautionary instruction regarding the jury's duties, Illinois Pattern Jury Instructions, Civil No 1.01 (3rd ed. 1995), in order to address the first note indicating there was a refusal to follow the law. To this, the plaintiff's counsel objected on the grounds that this would improperly emphasize one portion of the instructions over others. The defendants' attorneys proposed the second *Prim* instruction, and, in an effort to avoid any improper emphasis, a rereading

of the jury instructions in their entirety. The trial judge decided to read the second *Prim* instruction, followed by a rereading of the jury instructions in their entirety to avoid prejudicial emphasis.

"THE COURT: Good morning, everybody. We all very much appreciate your continued service in this case and all of your presence here today.

I have decided to read you one more instruction. This is a new instruction that I haven't read before, and then in an effort to help progress the deliberations, I'm going to re-read the instructions that I previously gave. I'd ask you to very carefully listen to my instructions again.

In a large proportion of cases, absolute certainty cannot be expected, nor does the law require it. If you fail to agree on a verdict, the case must be retried. Any future jury must be selected in the same manner as you were chosen. There is no reason to believe that the case would ever be submitted to another jury more competent to decide it or that the case could be tried any better or more exhaustively than it has been here, or that more or clearer evidence could be produced on behalf of any party."

¶ 35 The trial judge then proceeded to reread the original jury instructions and told the jury to "retire and reconsider the evidence in light of the Court's instructions."

¶ 36 At approximately noon that day, the jury sent a note asking to see the death certificate and, by agreement of the parties, the trial judge provided it.

¶ 37 Three hours later, at approximately 3:00 p.m., the jury returned its verdict, signed by all members, for the defendants. At the request of the plaintiff's attorneys, the trial judge polled the jury, explaining, "I will be asking each one of you the following questions: 'Was that then and is that now your verdict?' This is your opportunity to affirm that this is your verdict at the time that

you signed it and at this moment." When the questions were posed to the third juror, whom we will refer to as Juror 3, she responded "No." The trial judge then briefly questioned her:

"THE COURT: Would you explain? Was that when you signed the verdict form your verdict?

JUROR [3]: Yes.

THE COURT: And is it now your verdict?

JUROR [3]: No.

THE COURT: So[,] since the time that you signed the verdict form, you've changed your mind?

JUROR [3]: Yes, your Honor.

THE COURT: Okay. Have a seat."

¶ 38 The trial judge then polled the remaining jurors; all of whom affirmed the verdict. After polling the jury, the trial judge asked the jury to return to the deliberation room so the court could speak to all counsel. The plaintiff's counsel moved for a mistrial. The trial judge disclosed that Juror 3 was the author of the morning note about the stress of the deliberations. During the ensuing discussions, the defendants' counsel noted that Juror 3 did not appear ill, that Juror 3 never indicated she was under duress from the other jurors, and that none of the recent communication from any of the jurors indicated that the deliberations had stalled or that Juror 3's physical health was affected. The defendants' attorneys also emphasized that the third note was written six hours prior to the polling, prior to the second *Prim* and the cautionary instructions, and prior to the jury's request for and receipt of the death certificate, all of which supported the fact that the jury had been actively deliberating and considering evidence. When the plaintiff's attorneys responded that

the third note was an indication of duress, the trial judge disagreed, and later said, "you're making an assumption that her refutation of the signature of the verdict was due to undue influence. We do not have any evidence of that." After discussing options for proceeding and, over the plaintiff's objection and request for a mistrial, the trial judge elected to give the jury clean verdict forms and instruct them to continue their deliberations. The trial judge gave the following explanation:

> "THE COURT: Ladies and gentlemen, I am unable to enter a judgment on a verdict unless I find that it represents the unanimous verdict of all 12 of you, and I am not able to make that conclusion in light of the polling. I am giving you brand new Verdict Forms A and B along with special interrogatories, and I'm asking you to take them back into the jury deliberation and see if you can reach a unanimous verdict. Please stand and continue to deliberate."

¶ 39 The jury continued deliberations for approximately 90 minutes, and at 4:30 p.m., again returned with a verdict in favor of all defendants. The verdict form was again signed by all 12 jurors. Prior to polling the jury, the trial judge stated:

> "THE COURT: Ladies and gentlemen, I'm once again going to poll the jury.
>
> And I do want to explain something to you before I poll the jury. The reason I conduct this poll is to ensure that every juror truly assents to the verdict. The purpose of the formality of the polling in open court is to afford every juror before the verdict is recorded an opportunity for free expression unhampered by [fear], error or any duress.
>
> So now I'm going to read out your names and I will ask you was that now–was that then and is this now your verdict[.]"

¶ 40 Upon being polled, all jurors, including Juror 3, affirmed the verdict.

¶ 41 The trial judge then released the jury, adding that she would meet with the jurors in the deliberation room, at which time they could "ask me any questions and I will answer those that I can. You also have the opportunity to give me any constructive criticism because I will always take that to heart, and then when you leave the jury deliberation room, it is possible that the lawyers will want some insights from you. You are free to speak to the lawyers if you desire, and you are free to not speak to the lawyers. It is entirely up to you. OK?"

¶ 42 After meeting with the jurors, the trial judge returned to the bench. One of the plaintiff's attorneys asserted, "[Juror 3] did have hesitation before she said it was her verdict. There was a pause and hesitation and then she said it." Defense counsel responded, "[Juror 3] at all times when we saw the jury today, appeared to be composed. She was never teary, crying, upset. She was totally together. And I think anybody would have reason to be serious, and if that translates to a pause, then it does in such an important matter." The plaintiff's attorney did not dispute that Juror 3 appeared composed and calm. Defense counsel subsequently added that as she was leaving the courtroom after the verdict, Juror 3 had turned to defense counsel and said, "you presented a good case," and that when Juror 3 made the comment, she "never indicated any type of hesitation, duress, stress [regarding the unanimous verdict], and she certainly did not seem to be experiencing any type of physical malady." The trial judge asked if the attorneys had anything else to add to the record. They did not make any further remarks about Juror 3. The plaintiff's attorney thanked the court. The defense attorneys and court reporter then gathered their belongings and left the courtroom. The judge remained on the bench.

¶ 43 While the attorneys had been making this record, one of the attorneys representing the plaintiff had been outside the courtroom, speaking with Juror 3. This attorney returned to the

courtroom with Juror 3 and stated that the juror wanted to make a statement to the judge. Juror 3 then said that when she sent the note on March 14, 2019, she thought would have the opportunity to speak with the court; and that she felt threatened. The trial judge stopped Juror 3 from speaking further, and the exchange ended. On March 18, 2019, the trial judge gathered all the attorneys in order to describe for the record the court's post-trial encounter with one of the plaintiff's attorneys and Juror 3.

¶ 44 In a motion for a new trial, the plaintiff argued that Juror 3's notes from the jury room, responses when polled, and what the juror described in a post-verdict "sworn [oral] statement" established that the jury did not actually reach a unanimous verdict but had been coerced by the trial judge to believe they would be required to deliberate until they returned with a consensus. The plaintiff contended that instead of instructing and reinstructing the entire jury about its duties, the trial judge should have individually questioned Juror 3 "regarding the circumstance of her answers to the polling questions." The trial judge, instead, "repeatedly prevented [Juror 3] from informing the Court that she had reached a different decision than the other jurors and that they were a hung jury." The plaintiff argued that the trial judge also made a number of errors with respect to the evidence.

¶ 45 After full briefing and oral arguments, the trial court denied the post-trial motion and struck Juror 3's "sworn statement." The court reasoned that 1) the movant was asking the court to conclude that the jury was unable to understand the jury instructions, including the two *Prim* instructions, and, therefore, did not follow them; 2) after the second *Prim* instruction the jury asked for the death certificate, which indicated they were engaged in a good faith evaluation of the evidence; 3) after Juror 3 indicated she no longer agreed with her verdict, the court followed

procedures that had been approved by the appellate court; 4) when the jury emerged with new verdict forms in favor of the defendants, the court reiterated the reasons it was going to poll the jury and when polled, all of the jurors agreed with their verdict, and 5) when the court fielded questions and comments in the jury room, Juror 3 freely asked questions and made comments, and never indicated she was ill, coerced, or had any regret. The trial court then clarified that Juror 3 did not approach the court "immediately" after the verdict as the plaintiff was contending in her motion for a new trial. Rather, one of the plaintiff's attorneys followed Juror 3 out of the courtroom, Juror 3 then returned to the courtroom with the attorney "several minutes after the rest of the jurors left, and only after she had a conversation lasting several minutes with [the attorney]." The trial court remarked, "This more accurate [recitation] of the events as they unfolded following the verdict demonstrates the type of influence that the Supreme Court [has] commented on." The court struck the post-trial statement, due to its timing and the method and manner it had been taken, which included leading questions.

¶ 46 This appeal followed. With these facts in mind, we address the contention that the plaintiff should have been granted a new trial because the trial court had coerced Juror 3 into agreeing to a unanimous verdict. The plaintiff contends the trial court isolated Juror 3 by questioning her immediately after she dissented from the verdict, instructing her to stand, and asking her four questions not posed to any other juror. "Would you explain? Was that when you signed the verdict form your verdict?," "And is it now your verdict?;" "So since the time that you signed the verdict form, you've changed your mind?"). In addition, she argues, the trial court did not allow Juror 3 to provide her own explanation for her dissent and instead asked "rapid fire questions" that called for only a "yes" or "no" response which transformed the inquiry into an "accusation" that Juror 3

had simply flip-flopped on the verdict after leaving the jury room. The plaintiff contends the trial court trivialized Juror 3's dissent and added to the coercion that she was apparently experiencing in the deliberation room.

¶ 47 We review the trial court's handling of the jury for an abuse of discretion. *Freeman for Estate of Freeman v. City of Chicago*, 2017 IL App (1st) 153644, ¶ 60, 74 N.E.3d 205 (reviewing, for an abuse of discretion, whether a jury verdict was coerced and warranted a new trial); *Bianchi v. Mikhail*, 266 Ill. App. 3d 767, 780, 640 N.E.2d 1370, 1379 (1994) (reviewing, for an abuse of discretion, whether a jury was properly polled). Permitting the jury to continue its deliberations, determining how to instruct the jury, and deciding whether the verdict was coerced are all matters within the trial court's discretion, and will not be disturbed on review unless no reasonable person could adopt the trial court's view. *Freeman*, 2017 IL App (1st) 153644, ¶ 61; *see also Schultz v. Northeast Illinois Reg'l Comm. R.R. Corp.*, 201 Ill. 2d 260, 273-74, 775 N.E.2d 964, 973 (2002) (observing that the key determination is whether the trial court's instructions "fairly, fully, and comprehensively apprised the jury of the relevant legal principles"). This standard is a high one: abuse of discretion is "the most deferential standard of review available with the exception of no review at all." *Davis v. Kraff*, 405 Ill. App. 3d 20, 28, 937 N.E.2d 306, 314 (2010). As long as reasonable persons could differ as to the trial court's decision, an abuse of discretion has not occurred. *Davis*, 405 Ill. App. 3d at 28, 937 N.E.2d at 314. Motions for a new trial based on trial error also "rest within the trial court's sound discretion and will not be reversed unless the decision is a clear abuse of discretion." *Dupree on Behalf of Estate of Hunter v. County of Cook*, 287 Ill. App. 3d 135, 145, 677 N.E.2d 1303, 1310 (1997). Moreover, litigants are not entitled to an error-free trial; a new trial is appropriate only where trial error has materially affected the outcome of a

case. *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 47, 934 N.E.2d 506, 530 (2010) (reviewing courts are not concerned with whether the parties receive an error-free trial, only that the trial was free of substantial prejudice); *see Schultz*, 201 Ill. 2d at 281, 775 N.E.2d at 977 (finding error but not reversible error). When determining whether a verdict was coerced, we will review the totality of the circumstances. *Freeman*, 2017 IL App (1st) 153644, ¶ 61.

¶ 48 As a preliminary matter, we decline to consider Juror 3's post-verdict statement. The trial court ruled that under *Spatzel*, Juror 3's declaration about jury deliberations was both improper and inadmissible. *Spatzel v. Dillon*, 393 Ill. App. 3d 806, 814, 914 N.E.2d 532, 539 (2009) (a juror's statement regarding the motive, method, or process by which the jury reached its decision cannot be used and is not a basis for impeaching the verdict); *see also Martin v. Zucker*, 133 Ill. App. 3d 982, 991, 479 N.E.2d 1000, 1006 (1985) (a juror's statement about his or her subjective mental process is not a proper basis for granting a new trial); *Redmond v. Socha*, 216 Ill. 2d 622, 636, 837 N.E.2d 883, 892 (2005) (rule against the use of juror statements about deliberations safeguards the privacy of the jury room, protects the finality of judgments, and precludes the defeated party from setting upon and harassing jurors; the meaning and effect of a verdict is to be judged from the verdict alone). In order for us to consider the statement, the appellant was required to successfully challenge the trial court's decision to strike and not consider the statement. The plaintiff, however, does not appeal that ruling, or even acknowledge that the ruling occurred. Where the appellant has failed to argue that the trial court abused its discretion in rejecting and refusing to consider the juror's post-verdict statement, the issue has been waived and will not be considered. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (arguments not raised in the opening brief are considered waived and may not be raised in a reply brief or petition for rehearing).

¶ 49 Advocate Health, Dr. Gilles, and Dr. Zorriasateyn point out that the plaintiff's argument about jury coercion is fairly narrow, in that she has not argued against the trial court's decision to give the jury Illinois Pattern Jury Instructions Nos. 1.05 and 1.06 (what are known as the two *Prim* instructions). Illinois Pattern Jury Instructions, Civil Nos. 1.05, 106 (3rd ed. 1995); *Prim*, 53 Ill. 2d 62, 289 N.E.2d 601. The plaintiff did not challenge the language of either *Prim* instruction during the trial, and she does not argue on appeal that the instructions were improper or incorrectly given. Dr. McLeod filed a separate brief. Dr. McLeod also correctly notes that the plaintiff's statement of facts relevant to this appeal omits and at one point even misstates some of the procedural history set out above, and, thus, distorts the trial court's interaction with the jury in general and Juror 3 in particular. The plaintiff's post-trial motion contained similar errors and prompted the trial court to say during the hearing, "To set the record straight with regard to the circumstances that resulted in this post-verdict statement[,] I'm going to recite certain facts."

¶ 50 The plaintiff's argument focuses on the trial court's polling of the jury. We find that Juror 3 was not improperly isolated by being questioned immediately after she dissented from the jury verdict. As set out above, the trial court succinctly confirmed that Juror 3 had changed her mind and then the court continued to poll the rest of the jury. The trial court's procedure was neutral, efficient, and consistent with the holding in *Freeman*, 2017 IL App (1st) 153644, ¶¶ 65-66.

¶ 51 In *Freeman*, the jury returned its verdict for the plaintiff, but when polled, one juror replied that the verdict was not her voluntary verdict and that she signed the verdict form "[u]nder duress," "because we were told we wouldn't be let out of the room." *Freeman*, 2017 IL App (1st) 153644, ¶ 24. After polling the rest of the jury, the trial judge asked the dissenting juror to explain what she meant by "duress." *Freeman*, 2017 IL App (1st) 153644, ¶ 24. The judge emphasized that the juror

was not to disclose anything about the deliberations, because those were "private," but asked, "Do you want this to be your verdict, the verdict I read in court?" *Freeman*, 2017 IL App (1st) 153644, ¶ 24. When the juror responded "No," the judge asked the jurors to return to the jury room, discussed the matter with the attorneys, and then sent the jury home for the evening, so the issue could be researched. *Freeman*, 2017 IL App (1st) 153644, ¶ 25. The dissenting juror remained in the courthouse in an attempt to speak with the judge, but the judge refused the request, explaining that "it would be improper for the court to talk to her." *Freeman*, 2017 IL App (1st) 153644, ¶ 26. The next morning, the judge rejected counsel's argument that it would be best to inquire into the other jurors' "coercion" of the dissenting juror. *Freeman*, 2017 IL App (1st) 153644, ¶ 26. The court noted, " 'She used the word duress. But I think as counsel would agree[,] part of serving on a jury is stressful. You are asked to reach an important decision affecting the lives of several people * * *. So by its nature it is going to be a stressful process.' " *Freeman*, 2017 IL App (1st) 153644, ¶ 26. Instead, the judge then gave clean verdict forms to the jury and asked them to continue their deliberations. *Freeman*, 2017 IL App (1st) 153644, ¶ 26. Within minutes of resuming deliberations, the jury returned with a unanimous verdict. *Freeman*, 29 2017 IL App (1st) 153644, ¶ 28. The judge polled the jury again and all members affirmed the verdict to represent their decision. *Freeman*, 2017 IL App (1st) 153644, ¶ 28.

¶ 52 The appellate court affirmed the jury's verdict. The appellate court indicated the trial judge had properly questioned the juror after she expressed, during polling, that the verdict did not represent her decision in the case. *Freeman*, 2017 IL App (1st) 153644, ¶ 65. The appellate court also indicated the judge properly proceeded to give the jury clean verdict forms and correctly asked them to resume their deliberations. *Freeman*, 2017 IL App (1st) 153644, ¶ 67. "No court in this

State has ever held it error to continue the poll after discovering a dissenting juror, nor is the questioning of the dissenter improper of itself." *Freeman*, 2017 IL App (1st) 153644, ¶ 64 (*quoting People v. Chandler*, 88 Ill. App. 3d 644, 649, 411 N.E.2d 283, 288 (1980)). During the polling, the court should question the jurors individually to determine whether they agree with the announced verdict and the "[j]urors must be able to express disagreement during the poll or else the polling process would be a farce and the jurors would be bound by their signatures on the verdict." *People v. Kellogg*, 77 Ill. 2d 524, 528, 397 N.E.2d 835, 837 (1979). "The trial judge not only hears the juror's response, but *** can observe the juror's demeanor and tone of voice." *Kellogg*, 77 Ill. 2d at 529. While polling for present intent, the trial court "must be careful not to make the polling process another arena for deliberations." *Kellogg*, 77 Ill. 2d at 529. If a juror does dissent from the verdict, "then the proper remedy is for the trial court, on its own motion if necessary, to either direct the jury to retire for further deliberations [citation], or to discharge it [citation]." *Kellogg*, 77 Ill. 2d at 528-29. *Freeman* pointed out that the procedure it was endorsing contrasted with what occurred in *Kellogg*, *Freeman*, 2017 IL App (1st) 153644, ¶ 65 (*citing Kellogg*, 77 Ill. 2d 524). In *Kellogg*, the trial judge failed to respond to a juror's inquiry as to whether she could change her vote during the poll and instead asked her three times " 'was this then and is this now your verdict.' " *Freeman*, 2017 IL App (1st) 153644, ¶ 65 (quoting *Kellogg*, 77 Ill. 2d at 527). After the third time, the juror agreed it was her verdict. *Freeman*, 2017 IL App (1st) 153644, ¶ 65 (*citing Kellogg*, 77 Ill. 2d at 527).

¶ 53 The trial court in this instance adhered to the polling process approved in *Freeman*, by individually polling the jurors when they returned with the unanimous verdict form, focusing the inquiry on whether the verdict had been and still was each juror's verdict, succinctly questioning

Juror 3 when she expressed dissent, and using polar questions instead of an open-ended inquiry that might trip Juror 3 into disclosing the jury's private deliberations. *Freeman*, 2017 IL App (1st) 153644, ¶ 64 ("the questions asked by the court show that it sought to clarify what, exactly, about the verdict she disagreed with and what she meant she said that she gave her verdict under duress"). In this neutral exchange, the trial court clarified whether Juror 3 adhered to the verdict form she had signed and gave the juror freedom to unequivocally express her own verdict, unhampered by any fear or error that may have influenced the unanimous written form. After asking the jury to return to the jury room, the trial court discussed with the attorneys whether Juror 3 appeared to be in ill health or had manifested anything more than a normal reaction to the stress of serving on a jury, and also discussed the fact that the notes from the jury room had been sent much earlier in the deliberation process and prior to the second *Prim* instruction and the rereading of the cautionary instructions. The trial court then gave the jury clean verdict forms and asked them to continue deliberating, which made it clear to the entire jury that none of the members were bound by their previous written entries.

¶ 54 We disagree with the plaintiff's contention that *Freeman* endorsed "open-ended questions into why Juror [3] changed her verdict." Actually, the court asked one open-ended question, "Can you explain what you mean by duress?" and when the juror verged on an inappropriate disclosure about the deliberations process, the court cut off the response, reminded the juror about the privacy of deliberations, and asked polar questions: "Well, I'm asking you specifically, do you want this to be your verdict? The answer is what?." *Freeman*, 2017 IL App (1st) ¶ 24.

¶ 55 The plaintiff also unpersuasively argues that *Freeman*'s dissenting juror had no concerns about her health, yet Juror 3 authored a note stating she was "experiencing elevated blood sugar

levels and chest pain due to the stress of this deliberation. Please Help." As we noted above, the trial court and attorneys discussed whether Juror 3 appeared ill or unduly stressed. In addition, this third note from the jury room had been written six hours earlier and prior to the second *Prim* instruction, and the jury subsequently requested the death certificate, which indicated they were still deliberating. Furthermore, Juror 3 never suggested she was experiencing duress and the record contains no other evidence of undue influence.

¶ 56 *Freeman*, 2017 IL App (1st) 153644, is this judicial district's most recent decision regarding the appropriate way in which to address a deadlocked jury and a juror who changes his or her mind when polled. The trial court's handling of the initially deadlocked jury was consistent with the holding in *Freeman*, 2017 IL App (1st) 153644, ¶¶ 65-66.

¶ 57 The plaintiff suggests that the polling of the jury in this instance ran afoul of *Bianchi*, 266 Ill. App. 3d 767, because, she argues, the trial judge "isolated" Juror 3 "immediately after she dissented from the verdict, instructing her to stand and asking her four additional questions not asked of any other juror." The plaintiff misstates *Bianchi*'s significance. In *Bianchi*, when the first juror expressed doubt during polling, the court immediately ended the poll and sent the jury back to continue its deliberations. *Bianchi*, 266 Ill. App. 3d at 773. The jury returned with the same verdict, but the first juror had written " 'protest' " next to her name on the second verdict form. *Bianchi*, 266 Ill. App. 3d at 773. The court started the poll with this same juror, who again indicated disagreement during polling, at which point the court ended the poll and sent the jury back to deliberate. *Bianchi*, 266 Ill. App. 3d at 773. When the jury returned with their third verdict form, all of the jurors stated that the verdict was correct. *Bianchi*, 266 Ill. App. 3d at 773. The court entered the verdict and denied the plaintiff's motion for a new trial. *Bianchi*, 266 Ill. App. 3d at

773. The appellate court disapproved and found that the trial court's failure to poll the entire jury, and to stop the polling after polling only the one juror "effectively isolated the juror and conceivably could have had a coercive effect." *Bianchi*, 266 Ill. App. 3d at 781.

¶ 58 The trial judge in this instance did not make the same mistakes. Rather, the judge properly polled *all* of the jurors, ensuring that no one juror would feel isolated or coerced through the poll. Moreover, the trial judge emphasized before both polls–most importantly before the second poll– the critical purpose being served by the process:

"Ladies and gentlemen, I'm once again going to poll the jury. The reason I conduct this poll is to ensure that every juror *truly assents* to the verdict. The purpose of the formality of the polling in open court is to *afford every juror* before the verdict is recorded *an opportunity for free expression* unhampered by [*fear*], or any *duress*." (Emphasis added.)

¶ 59 That instruction comports with the fundamental purpose of a jury poll: to ensure that no individual juror has "been coerced by the other members of the jury into returning a certain verdict." *See Bianchi*, 266 Ill. App. 3d at 779.

¶ 60 We disagree with the plaintiff's contention that some of the trial court's remarks to the jury were similar to the prejudicial remarks made in *Preston*. *Preston ex rel. Preston v. Simmons*, 321 Ill. App. 3d 789,747 N.E .2d 1059 (2001). The plaintiff refers to the portion of the trial when the judge said the following:

"THE COURT: All right. I'm going to ask you to step into the jury deliberation room and I will join you in there shortly. I want to have a sidebar with the lawyers. I do not expect to keep you here that much longer."

¶ 61 In *Preston*, defense counsel objected to any instructions or comments besides the first *Prim*

instruction. *Preston*, 321 Ill. App. 3d at 797, 747 N.E.2d at 1067. Nevertheless, the trial judge made some prefatory remarks before giving the first *Prim*:

> "THE COURT: I have this instruction that I'm going to give you and then I'm going to require that you return to the jury room and continue your deliberations. And before I give that instruction I'm going to tell you that in roughly 14 years that I have sat as a judge presiding over jury trials I have had one other occasion in which a jury was not capable of reaching a unanimous verdict, that's referred to as a hung jury. The result of that is of course that you start all over again, pick a new jury and present all of your evidence once again. That is a very expensive undertaking to both sides [in] a contested lawsuit. It involves taking up the jury time of 12 other citizens and the Court's time instead of hearing another case that has not yet had its opportunity to be here.
>
> And in that one instance, let me tell you that the second jury reached a verdict and I did not perceive any variance in the evidence that was presented the second time from that which was presented the first time. And I asked myself what was the difference, and the only difference that I could understand because I was not part of the deliberations was that the second jury was able to take the same facts, filter it and make a determination of how the case should be decided.
>
> I'm very pleased with the composition of this jury. I believe that each one of you is an intelligent, fair-minded, honest human being who chooses to do the right thing. I'm not saying this to you so that you feel badly or that you question your own integrity or honesty nor am I attempting to influence your determination because if in fact you cannot reach a verdict then that is the law and that's what we'll live with and another jury will hear the

case. If these cases were easy, we wouldn't need you." *Preston*, 321 Ill. App. 3d at 797-98.

¶ 62 "When a jury communicates to the court its inability to reach a unanimous verdict, the court may, in its discretion, proffer some guidance, including the giving of a supplemental instruction." *Preston*, 321 Ill. App. 3d 799; *People v. Branch*, 123 Ill. App. 3d 245, 251, 462 N.E.2d 868, 872-73 (1984) ("it appears well-settled that the trial court has a responsibility to proffer some type of guidance to a jury which has expressed its inability to achieve unanimity in its deliberations and has sought direction from the trial court"). However, the additional commentary that was given in *Preston* could have improperly coerced the jury to return a verdict. We find no similarity between the *Preston* and the instant case. The remarks were succinct, consistent with *Prim*, and as a whole the instructions were not coercive.

¶ 63 The plaintiff next contends that *People v. Smith*, 271 Ill. App. 3d 763, 649 N.E.2d 71 (1995) is "remarkably analogous." However, in that case, the trial judge failed to instruct the jury to continue deliberating after one juror dissented and failed to poll all of the jurors after they were recalled, and instead questioned only two of them. *Smith*, 271 Ill. App. 3d at 767, 649 N.E.2d at 74. The trial judge in this instance did instruct the jury to continue deliberating, with the assistance of the first and then the second *Prim* instructions, and all of the jurors were included in the polling. Thus, there is no similarity between *Smith* and the instant case.

¶ 64 We are not persuaded that the trial judge abused her discretion in instructing and polling the jury. Having considered the instructions to the jury as a whole, we conclude the instructions were proper, the trial judge's procedure and conduct were not coercive, and the entry of judgment on the jury's verdict was proper.

¶ 65 The plaintiff next contends the trial court should not have barred her from impeaching

defendant Dr. Zorriasateyn with a "prior" inconsistent statement. She refers to the physician's testimony that when Mr. Pineiro was treated in January 2014, Dr. Zorriasateyn's responsibilities as an "urgent hospitalist" did not include responding to emergencies on the first floor of the hospital, which was where the emergency department was located. She cites an answer that Dr. Zorriasateyn filed in an unrelated breach of contract claim that was initiated in the circuit court's Chancery division in 2017. In that 2017 answer, the doctor stated, "As an urgent hospitalist, Dr. Zorriasateyn responds to emergencies originating either from within Trinity's emergency room, or another onsite location at Trinity."

¶ 66  As quoted below, the trial transcript indicates that the use of the 2017 answer was discussed during a sidebar, in which the court clarified that the plaintiff could make use of a 2013 contract which governed Dr. Zorriasateyn's work at Advocate Trinity Hospital when Mr. Pineiro received medical care there on January 4-5, 2014. As the sidebar continued, the plaintiff's attorney asked about also using the 2017 answer from the other lawsuit, and the court deferred ruling until relevant testimony was elicited.

> "THE COURT: That [2013] contract you can question him about. It was disclosed, he signed it, you can question him about it.
>
> [PLAINTIFF'S ATTORNEY]: Now just so we don't have to come back here [for another sidebar], this is the 2017 [(sic)].
>
> * * *
>
> [THE COURT]: Whether or not somebody can be impeached on pleadings from another case, *** if I would have known this issue was coming up, I would have pulled the case law. But I don't think you can use pleadings in another case.

* * *

*** I don't think that he has specifically denied these statements, at least not yet on this statement.

And whether or not [the law would permit a pleading from a different case to] be used to impeach him in this case, I'm not convinced it can. But certainly[,] it can't be used to impeach him when he hasn't even said anything contrary to this yet. So[,] we'll see how it goes.

[PLAINTIFF'S ATTORNEY]: Okay."

¶ 67 The trial court and attorneys then returned to the courtroom, where the plaintiff's attorney resumed questioning Dr. Zorriasateyn.

¶ 68 In their response brief, Advocate Health, Dr. Gilles, and Dr. Zorriasateyn point out that the plaintiff has not cited any indication in the report of proceedings that she tried to make use of the 2017 pleading to impeach Dr. Zorriasateyn. These defendants attribute the lack of record citation to the fact that the trial court never actually barred the plaintiff from using the 2017 pleading. These defendants contend this argument has been waived due to the lack of citation and waived for the additional reason that the plaintiff failed to make an offer of proof in order to preserve the issue for appellate review. In his separate brief, Dr. McLeod responds that the plaintiff's argument is not directed at him, but if need be, he adopts the other defendants' response.

¶ 69 In her reply brief, the plaintiff contends that prior to the sidebar, Dr. Zorriasateyn's testimony did implicate the 2017 pleading, and that the sidebar ruling prevented her from subsequently returning to the topic.

¶ 70 This reply, however, cannot be reconciled with counsel's indication during the sidebar that

the 2017 pleading might *become* relevant, when he said, "Now just so we don't have to come back here [for another sidebar], this is the 2017 [pleading]." Furthermore, counsel failed to disagree with the trial court's recollections about Dr. Zorriasateyn's previous testimony, stating, "I don't think that he has specially denied these statements, at least not yet on this statement," and "But certainly it can't be used to impeach him when he hasn't even said anything contrary to this yet." Counsel merely replied "Okay," instead of disagreeing with the court's recollection and pressing for a ruling about the 2017 pleading during the sidebar. Also, although the court appears receptive to the topic, stating, "So we'll see how it goes," the plaintiff has not cited a subsequent attempt to elicit testimony or a ruling on that topic. Alternatively, if counsel construed the court's recollection during the sidebar as a rejection of the 2017 pleading, counsel failed to respond with an offer of proof, and merely said "Okay."

¶ 71 The argument has been waived on appeal due to the plaintiff's failure to provide record citation indicating she was prevented from impeaching Dr. Zorriasateyn with the 2017 pleading. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (appellant's brief must include argument supported by citation to the supporting record and legal authority); *Mielke v. Condell Memorial Hospital*, 124 Ill. App. 3d 42, 48-49, 463 N.E.2d 216, 222 (1984) (unless reference is made to a portion of the record that supports reversal, argument will not be considered). In the alternative, if we construe the sidebar as a ruling that barred the plaintiff from using the 2017 pleading, the issue has been waived on appeal in the absence of an offer of proof. *Volvo of America Corp. v. Gibson*, 83 Ill. App. 3d 487, 491, 404 N.E.2d 406, 409 (1980) (the purpose of an offer of proof is to inform the trial court, opposing counsel, and a court of review of the nature and substance of the evidence sought to be introduced); *Sullivan-Coughlin v. Palos Country Club, Inc.*, 349 Ill. App. 3d 553, 561,

812 N.E.2d 496, 503-04 (2004) (when a trial court refuses evidence, the ruling is not appealable unless an offer of proof has been made). Accordingly, we do not find that the trial court abused its discretion as the plaintiff contends.

¶ 72 The plaintiff presents four other arguments regarding evidentiary rulings and an instruction that was given to the jury, but the plaintiff does not support these issues with citation and discussion of relevant authority. The defendants point out that citation and analysis are mandated by the rule regarding the contents of an appellant's opening brief. *See* Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (opening brief's argument section shall include citation to authorities relied upon and "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"); *Atlas v. Mayer Hoffman McCann, P.C.*, 2019 IL App (1st) 180939, ¶ 33, 143 N.E.3d 781 (finding that an issue had been forfeited where appellant did not provide cohesive argument and pertinent authority). We add that we compiled most of the trial summary above (aided by the defendants' briefs), because the plaintiff's statement of facts consisted of only about 10 paragraphs and lacked the detail necessary to understand this appeal. *See* Ill. S. Ct. R. 341(h)(6) (eff. Nov. 1, 2017) (opening brief's statement of facts section "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal); *Board of Managers of Eleventh Street Loftominium Ass'n v. Wabash Loftominium, L.L.C.*, 376 Ill. App. 3d 185, 187, 876 N.E.2d 65, 68 (2007) (striking a statement of facts which was argumentative, confusing, and did not "convey a complete picture of the proceedings.")

¶ 73 The plaintiff replies that we could, in our discretion, proceed with our review because "we can discern the question sought to be resolved." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 493,

771 N.E.2d 357, 364 (2002). The appellant in the case that she cites, *Dillon*, presented numerous issues, but only one of those was insufficiently briefed, and it was a straightforward, minor issue that the court was able to resolve in just two sentences after reviewing the relevant portions of the record. *Dillon*, 199 Ill. 2d at 493, 771 N.E.2d at 364. Here, the plaintiff is proposing something else. What she suggests would not only shift the appellant's burden of research and argument to the court, but it would also deprive the appellees of their opportunity to make meaningful counterargument. Moreover, *Dillon* relied on *Touchette*, in which the court said that its willingness to overlook certain deficiencies in the appellant's brief was not to be construed as "an effacement of the rule" and it cautioned future litigants to adhere to their duties. *Dillon*, 199 Ill. 2d at 493, 771 N.E.2d at 364 (*citing People ex rel. Carter v. Touchette*, 5 Ill. 2d 303, 305-06, 125 N.E.2d 473, 475 (1955)). Because the precedent does not support what the plaintiff is proposing, we decline to proceed further.

¶ 74 Furthermore, even if we were willing to consider these other arguments, the plaintiff would still have to show that absent the purported errors, either individually or cumulatively, the outcome of the trial would have been different. *Jackson v. Pellerano*, 210 Ill. App. 3d 464, 471, 569 N.E.2d 167, 172 (1991) (medical malpractice appeal indicating the appellant bears the burden of showing an evidentiary error was substantially prejudicial to the extent it affected the trial's outcome and that where it appears an error did not rise to that level or where the reviewing court can see from the entire record that no harm was done, the judgment will not be disturbed). This, she has not done.

¶ 75 We find the four unsupported arguments have been waived. *Atlas*, 2019 IL App (1st) 180939, ¶ 33, 143 N.E.3d 781; *Golf v. Henderson*, 376 Ill. App. 3d 271, 280, 876 N.E.2d 105, 113

1-19-1638

(2007).

¶ 76    Having reviewed and rejected the appellant's first argument and having found the appellant waived her remaining five arguments, we affirm the trial court's judgment.

¶ 77    Affirmed.